IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
DISTRICT OF ATLANTA

**FILED IN CLERK'S OFFICE**
**U.S.D.C.-Atlanta**

**JUN 19 2006**

LUTHER D. THOMAS, Clerk
By: _FRancKnu_
Deputy Clerk

VEOLIA WATER NORTH AMERICA )
OPERATING SERVICES LLC f/k/a )
U.S. FILTER OPERATING SERVICES, INC. )
                                     )
            Plaintiff,               )
                                     )     CIVIL ACTION FILE-
    vs.                              )     NO. **1 06 CV 1457**
                                     )
CITY OF ATLANTA,                     )          **TWT**
                                     )
            Defendant.               )
_____)

## COMPLAINT

COMES NOW Plaintiff Veolia Water North America Operating Services LLC

f/k/a U.S. Filter Operating Services, Inc. ("Veolia" or "Plaintiff"), by and through its

undersigned counsel of record, and files this Complaint against Defendant City of Atlanta

("City" or "Defendant"), stating as follows:

## PARTIES AND JURISDICTION

1.

Veolia is a limited liability company organized and existing under the laws of the

State of Delaware, with its principal place of business located at Houston, Texas.

Plaintiff is licensed to conduct business in the State of Georgia.

2.

The City is a Georgia municipal corporation and, thus, a citizen of the State of

Georgia.

3.

This Court maintains jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a), as Veolia and the City are citizens of different states and the amount in controversy exceeds $75,000.00.

4.

Venue is proper before this Court as the dispute arose over the provision of services and materials on property located in the Northern District of Georgia.

5.

Plaintiff otherwise has satisfied all conditions precedent necessary for the institution of this action.

## FACTS

6.

In the 1990's, the City determined that the biosolids incinerator at various water reclamation centers, owned and operated by the City, emitted hazardous air pollutants, including dioxins and volatile organic compounds that are precursors of ozone. Further, the City was aware that the files of the Georgia Environmental Protections Division contained many documents memorializing complaints concerning emissions from said biosolids incinerators and the cause of those complaints, including improper operating practices. These facts caused the City to desire to minimize contributions to production of ozone, reduce odor problems associated with incineration of biosolids and to investigate alternative methods of biosolids disposal that would eliminate the need for incineration.

2

7.

On April 3, 2001, the City issued a request for a statement of qualifications/ request for proposals for long term Biosolids Managements Services (the "RFP"). The RFP contemplated management of the biosolids services for the City over a period of twenty (20) years. The City's goal was to institute full beneficial reuse of the City's biosolids using an approach that would maximize the environmental benefit of this nutrient-rich product and phase-out incineration as a means of biosolids disposal.

8.

The RFP envisioned an integrated Design Build and Operation approach for the entity which eventually procured the contract. Said entity would design, build and operate the facilities necessary for the new biosolid disposal process. While completing the Design Build portion of the work, the entity would manage the existing biosolid disposal system, which would remain and be adopted into the new system.

9.

The RFP provided that implementation of the Design Build portion of the contract would take place over a multi- year period, which would include phasing in of new facilities to facilitate the new biosolid disposal process (the "Design Build Improvements"). The RFP also provided information concerning the then current operation of the biosolids facilities, the condition of the facilities and the characteristics of the incoming biosolids ("influent") to be treated at the facilities.

10.

Veolia's proposal was submitted in October of 2001. The Design Build Improvement aspect of Veolia's proposal included the design and construction of a 100

dry ton per day biosolids treatment facility which would generate not less than 90 percent Class-A beneficial reuse product and the use of a SEGHERS thermal drying process to treat the 100 tons of biosolids.

11.

Repairs to and replacement of existing equipment were critical to the Veolia's plan for operation of the biosolids facilities. In conjunction with Veolia's modifications to the City's thermal processors, digester facilities, and methane gas storage and transmission systems, Veolia planned to increase the quality and quantity of the methane gas produced. In turn, this gas would be used to fuel the dryers thereby reducing natural gas demand. Further, there was a plan for installation of new higher efficiency centrifuges and repairs to existing centrifuges which would reduce the water content of the solids and increase the efficiency while decreasing the cost of sludge disposal.

12.

All of the Design Build Improvements, replacements and repairs were to be completed in order to bring these efficiencies and corrections online to allow proper and efficient operation of the facilities going forward.

13.

It was anticipated that, were Veolia the successful proposer, it would sign a contract and assume control of the facilities in January 2002 and would immediately commence the required repairs, replacements and Design Build Improvements.

14.

The City selected Veolia, thereby accepting Veolia's proposal to design and construct a 100 dry ton per day biosolids treatment facility which would generate not less

4

than 90 percent Class-A beneficial reuse product and the use of a SEGHERS thermal drying process to treat the 100 tons of biosolids.

15.

Due to City delays, the Final Services Agreement for Long-Term Biosolids Management Services (the "Agreement") was not executed until on or about August 1, 2002 and Veolia did not assume control of the facilities until December of 2002, almost one (1) year later than contemplated under the RFP. A copy of the main body of the Agreement is attached as Exhibit "A" to this Complaint and incorporated by reference. Due to the voluminous nature of the various documents which are part of the Agreement, they are not attached to this Complaint. Those documents which are part of the Agreement include, without limitation, the RFP and Veolia's proposal.

16.

The Agreement included a scope of work for the repairs, replacements and Design Build Improvements.

17.

Upon initiation of operation of the facilities on December 2, 2002, Veolia learned that it was faced with numerous material unforeseen and unanticipated conditions.

18.

The source of these unforeseen and unanticipated conditions included, but was not limited to, the following:

(a)     The condition of the digesters was much worse than anticipated or could
        have been discovered prior to the Veolia beginning operation of the
        facilities. As a result of these unforeseen conditions, the equipment was
        unable to digest properly, and Veolia could not reduce the solids volume

5

or produce methane to the levels and quantity specified in the Agreement. This immediately caused an increase in the cost for disposal, an increase in operation labor to reduce the solids loading to meet permit, and inadequate methane supply causing an increase in natural gas costs. These operating costs were, of course, in addition to the increased cleaning and repair costs necessitated by the condition of the digesters.

(b)     The City's staff, between January 2002 and December 2002, essentially abandoned maintenance of the facilities equipment and ignored operational requirements. A key example was staff's failure to maintain the heating equipment in the digesters thereby causing anaerobic digestion to cease. A further indication of the neglect of digesters was there use by staff as holding tanks. This caused significant control problems for both the digestion and de-watering processes. These exacerbated the inherent uncertainties in the plans for digester cleaning and repair.

(c)     The biosolids management facilities equipment was damaged during that 11-month period. The biosolids grinders for the digesters were abandoned or removed from the heat exchanger piping; the biosolids re-circulation and gas mixing systems were non-functional, and numerous centrifuges were severely damaged or even completely out of service.

(d)     The influent from the City was materially different from what was specified in the Agreement. This non-specified influent essentially brought anaerobic digestion to a halt, and excess grit destroyed grinders, rabble arms and centrifuges, prevented proper cleaning and repairs of the

6

> digesters, and necessitated repairs and capital expenditures to damaged
> equipment.

19.

These and other events and conditions were beyond the reasonable control of
Veolia and were not the result of a willful or negligent act, error or omission, failure to
exercise reasonable diligence or breach of the Agreement on the part of Veolia.

20.

Once it began operating the biosolids facilities, Veolia was forced to address these
events and conditions and, as a result, incurred substantial additional start-up costs as
well as repair costs beyond those called for in the original scope of the Agreement.

21.

These events and conditions were so different than anticipated that Veolia was
directed by the City to provide a revised scope of work for the Design Build
Improvements to the City. Had these changes been implemented, they would have
increased the price for the Design Build Improvements from $53,529,000 to
$64,958,583.00. These additional costs were needed for repair and replacement of
existing equipment and to address operational necessities arising from the unforeseen and
unanticipated circumstances.

22.

Due to the unforeseen and unanticipated circumstances, the City paid Veolia in
excess of $5.6 million to compensate it for additional operational costs and repairs, all of
which were incurred in 2002 and 2003.

7

23.

In April 2003, the City directed Veolia to suspend the design and construction of the pelletizers and sought assistance from Veolia in achieving a modification to the plan for the biosolids facilities. Upon information and belief, City staff suspended the pelletizer work without the knowledge or approval of the City Council.

24.

When the City suspended portions of the Design Build Improvements in April of 2003, it changed the entire operational plan for the facilities. For example, it became necessary for Veolia to plan for continued incineration and/or additional landfill disposal of biosolid material, which had been eliminated or significantly reduced under the Agreement. It also affected the entire overhaul of the biosolids management facilities and the suitability of the condition of those improvements for proper utilization and service over the ten plus year term of the Agreement. Additionally, because the Design Build Improvements were to be performed in conjunction with other necessary repairs and replacement to other equipment at the biosolids management facilities, the suspension of a major portion of the Design Build Improvements necessarily affected any other capital improvements that would have been a part of any overall plan for proper facilities operation and maintenance.

25.

Despite the proven thermal drying technology contemplated in the Agreement, the City determined that its financial resources could be best employed with an alternative approach. In response to the City's suspension and at the City's direction, Veolia undertook a substantial re-evaluation of the entire biosolids project. The parties worked to develop a possible re-scope of the work. ("Possible Re-Scope").

8

26.

The Possible Re-Scope contemplated utilizing the existing digesters, de-watering technology and thermal processing technology. The incinerators were to be upgraded and the ash from incineration was to be utilized as a by-product that could be sold in the market place for construction materials.

27.

The Possible Re-Scope also contemplated changes to the Design Build Improvement and necessitated changes in the operation and maintenance budget to incorporate the new process improvements, adjusted construction schedule and revised operating plan. The operating plan under the Agreement, which included elimination of the incinerators and replacement with the pellteizers, obviously would have had significantly different parameters than the existing thermal processing system that was now to be upgraded.

28.

In order to accomplish the goals set forth in the Possible Re-Scope, all parties understood that improvements to a majority of the existing assets would be required and new high efficiency equipment would have to be installed. None of these changes, however, changed the fact that all digesters still needed to be cleaned, inspected and repaired.

29.

By its letter of December 23, 2003 (the "December 2003 City Letter"), attached hereto as Exhibit "B," the City confirmed that anticipated and detailed contract modification, and that the parties had agreed to pursue an amendment to the Agreement encompassing the Possible Re-Scope.

9

30.

Veolia, at the direction of the City, moved forward with certain aspects of the
Possible Re-Scope work during the first half of 2004. As it performed this work, it
repeatedly asked that the City pursue an amendment to the Agreement encompassing the
Possible Re-Scope as promised in the City's December 2003 Letter.

31.

To date, the suspension has not been lifted and no modification of the Agreement
encompassing the Possible Re-Scope occurred.

32.

Veolia completed certain items of additional work directed by the City and as
necessitated by unforeseen and unanticipated conditions to allow proper and continued
operation of the facilities.

33.

Veolia continued to demand payment for its ever increasing costs of Design Build
Improvements, repairs, replacement work, operation and work beyond the scope of the
Agreement, all of which were caused by the City's actions and unforeseen and
unanticipated conditions.

34.

While certain payments were made by the City in response to Veolia's requests,
the City has continually refused to totally compensate Veolia for the work performed.

35.

In addition to failing to compensate Veolia for Design Build Improvements,
replacements and repairs made at the City's direction, the City has continually refused to

10

pay Veolia's monthly service fee as required under the Agreement for operation and management of the biosolids facility.

36.

The parties have, since the beginning of Veolia's presence on this site, been operating under a different set of circumstances than contemplated by the Agreement. Further, since April of 2003, when the City suspended the original Design Build Improvements, the parties have operated under a relationship that is significantly different than what is contemplated by the Agreement. As a result, Veolia is entitled to be paid for its work on a quantum meruit basis.

## COUNT I

### (Breach of Contract)

37.

Veolia reavers and realleges the allegations contained in Paragraphs 1 through 37 hereinabove.

38.

Veolia and the City entered into the Agreement on or around August 1, 2002.

39.

The City has materially breached the Agreement through its actions which include, but are not limited to, the following:

(a)   Failure to provide the facilities as represented in the Agreement.

(b)   Failure to provide for an equitable adjustment to the Agreement for the suspension of the Design Build Improvements. Such additional costs include all direct costs of any necessary capital improvements arising from the City's failure to proceed with the original plan Design Build

11

Improvements, as well as all additional operational costs associated with the suspension.

(c)     Failure to compensate Veolia for numerous capital improvements and repairs which were necessitated by unforeseen and uncontrollable circumstances.

(d)     Forcing Veolia to proceed with various items of capital improvements without contractually mandated change orders.

(e)     Failure to compensate Veolia for force-account work as contemplated under the Agreement.

(f)     Requiring capital improvements and modifications beyond that called for in the Agreement.

(g)     Failure to compensate Veolia for capital improvements to the extent the work was within the scope of the original scope of the Design Build Improvements.

(h)     Failure to compensate Veolia for all digester cleaning and repair work, which was treated as an allowance under the original Design Build Improvements and subject to reimbursement on a cost-plus basis.

(i)     Failure to engage in the dispute resolution process outlined in Article 19 of the Agreement (the "Dispute Resolution Process").

(j)     Failure to develop Minimum Equipment Performance Standards at the inception of the Agreement, as required thereunder.

(k)     Refusing to remit payment to Veolia for change order work, time and material work, and monthly service fees.

12

     (l)     Failure to pay Veolia on a cost plus basis as required under the Agreement due to the suspension.

     (m)    Delaying Veolia's performance of Design Build Improvements, replacements and repairs and failing to pay for all costs resulting from such delays.

40.

As a direct and proximate result of the foregoing breaches of the contract, Veolia suffered damages to date in excess of $25,000,000, plus interest. Veolia continues to be damaged on a daily basis. The exact amount of Veolia's damages will be proven at trial.

41.

The City's failure to engage in the Dispute Resolution Process was a willful and material breach of the Agreement and as a result of such breach, the City has waived its rights pursuant to the Dispute Resolution Process, including those provisions of the Dispute Resolution Process relating to exclusive jurisdiction for disputes and jury trial waiver.

42.

Veolia has satisfied all necessary conditions precedent for the bringing of this claim and otherwise has satisfied its obligations under the Agreement.

## COUNT II

### (Quantum Meruit/Unjust Enrichment)

43.

Plaintiff reavers and realleges the allegations contained in Paragraphs 1 through 43 hereinabove.

13

44.

Veolia provided material and services for the benefit of the City.

45.

Veolia provided materials and services for the improvement of property owned by the City.

46.

The City received the materials and services provided by Veolia and said materials and services were of benefit to the City.

47.

The City has failed to compensate Veolia in toto for the materials and services it has provided, even though the City received and continues to enjoy the benefits bestowed on them by Veolia.

48.

As a direct and proximate result of the City's failure and refusal to pay Veolia for the materials and services it received, Veolia suffered damages in excess of $25,000,000, plus interest. Veolia continues to incur damages on a daily basis. The exact amount of Veolia's damages will be proven at trial.

49.

Veolia is entitled to quantum meruit/unjust enrichment recovery for the value of the materials and services it has rendered for the benefit of the City, plus interest, overhead and profit.

14

50.

Veolia has satisfied all necessary conditions precedent for the bringing of this claim and otherwise satisfied its obligations under the Agreement.

## COUNT III

### (Declaratory Judgment)

51.

Veolia reavers and realleges the allegations contained in Paragraphs 1 through 51 hereinabove.

52.

A dispute has arisen and a justifiable controversy now exists between Veolia and the City as to the rights and liabilities of the parties under the Agreement.

53.

Veolia contends that the City has materially breached the Agreement in numerous ways, as set forth in above, but most notably by:

(a) Failing to pay Veolia for Design Build Improvements, replacements and repairs which were required by the City.

(b) Failing to pay the monthly service fees as required under the Agreement.

(c) Failing to participate in the Dispute Resolution Process, thereby resulting in a waiver of the contractual provisions relating to exclusive jurisdiction for disputes and jury trial waiver.

54.

Veolia is informed and believes that the City contends to the contrary.

15

55.

Veolia is informed and believes that the City intends to declare Veolia in default under the Agreement and believes that the City may take action pursuant to Section 15.03 of the Agreement to draw on that certain Letter of Credit number 3050199 issued by Bank of America. Veolia asserts that the Agreement has been vitiated by the actions of the City and as a result the City no longer has any right to draw on the Letter of Credit. Any such draw would be made in bad faith and would be improper.

56.

A declaration of rights, responsibilities and obligations of Veolia and the City is essential to determine their respective obligations in connection with the Agreement.

57.

A determination as to whether the City has materially breached said Agreement is necessary for a determination of the dispute to guide and protect Veolia from uncertainty and insecurity with regard to Veolia's future conduct, which if taken without direction might reasonably jeopardize Veolia's interests.

## COUNT V

(Attorneys Fees)

58.

Veolia reavers and realleges the allegations contained in Paragraphs 1 through 57 hereinabove.

59.

According to the terms of the Agreement, Veolia is entitled to its attorneys' fees and costs incurred in prosecuting this action. Pursuant to O.C.G.A. § 13-1-11, Veolia hereby notifies the City that it has ten days from its receipt of this Complaint to pay the

16

obligation, as set forth herein, without said attorneys' fees. If the City satisfies its obligation within this time, the requirement to pay attorneys' fees shall be void and the Court shall enforce the attorneys' fees provision within the Agreement.

WHEREFORE, Veolia prays that this Court:

a.   Under Count I, enter judgment in favor of Veolia and against the City for general damages in excess of $25,000,000, the exact amount to be shown at trial;

b.   Under Count II, enter judgment in favor of Veolia and against the City for general damages in excess of $25,000,000, the exact amount to be shown at trial;

c.   Enter declaratory judgment in favor of Veolia and against the City showing that the City has materially breached the Agreement;

d.   Grant Veolia its reasonable attorneys' fees and expenses of litigation; and

e.   Grant Veolia such other and further relief as the Court may deem just and proper.

Respectfully submitted this ____ day of June, 2006.

**WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC**

DAVID A. DIAL
Georgia Bar No. 220329
DAVID J. LARSON
Georgia Bar No. 438459
CHRISTOPHER T. BYRD
Georgia Bar No. 100854

Suite 3000, 950 East Paces Ferry Rd.
Atlanta, Georgia 30326
404-876-2700

Attorneys for Plaintiff

18