IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VEOLIA WATER NORTH
AMERICA OPERATING SERVICES
LLC, formerly known as
U.S. Filter Operating Services, Inc.,

   Plaintiff,

     v.

CITY OF ATLANTA,

   Defendant.

CIVIL ACTION FILE
NO. 1:06-CV-1457-TWT

ORDER

This is an action for breach of contract. It is before the Court on the Plaintiff's Motion for Partial Summary Judgment [Doc. 172], the Defendant's Cross Motion for Summary Judgment [Doc. 181]. For the reasons set forth below, the Defendant's Motion for Summary Judgment [Doc. 181] is GRANTED and the Plaintiff's Motion for Partial Summary Judgment [Doc. 172] is DENIED.

I. Introduction

This case arises out of a contract dispute between Defendant City of Atlanta ("the City") and the Plaintiff, Veolia Water North America Operating Services, formerly known as U.S. Filter Operating Services, Inc. ("Veolia"), relating to the

operation of the City's Water Reclamation Centers. Traditionally, the City disposed of solid waste produced at its wastewater treatment plants through such methods as incineration and landfill disposal. In 1997, the City Council authorized modifications to existing incinerators. In the resolution, the City Council made clear that the upgrades were designed to be a short term solution to comply with EPA requirements while the City explored "alternate practices" for "using the nutrients in the biosolids for beneficial purposes." (Pl.'s Mot. for Partial Summ. J., Ex. C). These beneficial purposes included land application for silviculture and agriculture. Id. By April 2001, the City sought Requests for Statement of Qualifications/Request for Proposals ("RFP") to accommodate the City's expressed desire to dispose of biosolids in a more environmentally-acceptable fashion. The proposal included the design and construction of capital improvements to the City's Water Reclamation Centers ("WRC's") as well as biosolids management and operations at the WRC's. On October 12, 2001, U.S. Filter Operating Services, Inc. ("USFilter") submitted a proposal to dispose of the City's biosolids through processes known as indirect thermal drying and pelletization. (Pl.'s Mot. for Partial Summ. J., Ex. D, at 2). The proposal envisioned 25,000 tons worth of pellets per year to be sold as fertilizer in various forms. (Id., at 5). The City accepted USFilter's proposal and, after approximately ten months of negotiations, the Long-Term Biosolids Management

Agreement ("the Agreement") was executed in October 2002. The Agreement consisted of two main parts: (1) a $54 million capital improvement plan over the course of 48 months; and (2) ten year "design-build-operate" partnership with two five year extensions. USFilter, along with other entities in the Atlanta Biosolids Consortium began operating the City's biosolids processing and disposal facilities in December 2002. (Def.'s Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex. 10).

Within weeks of the contract taking effect, both parties realized they could face financial struggles under the Agreement. The City was concerned about its ability to fully fund the $54 million worth of capital improvements. (Pl.'s Mot. for Partial Summ. J., Ex. H). On April 16, 2003, the City notified the Plaintiff of its financial problems and exercised its contractual rights to suspend the capital improvements plan. (Pl.'s Mot. for Partial Summ. J., Ex. I). Soon after assuming responsibility for the biosolids side of the WRC's, the Plaintiff discovered that the operational parameters at four of the facilities had dramatically changed since the initial RFP issued 18 months earlier. In addressing these changed conditions, the Plaintiff incurred substantial additional start-up and repair costs beyond those anticipated in the Agreement. The parties also discovered that significant additional capital improvements were required to properly process the biosolids, such that the capital

budget would be almost $65 million, rather than the originally projected budget of $54 million.

Accordingly, after the City suspended the capital improvements, the parties began negotiations on revising the scope of the original Agreement. By December 2003, all parties agree that they had agreed in principle to a so-called "Re-Scope." Essentially, although the Re-Scope included some carry-overs from the original project, it contained new design/build projects that superseded the pelletization projects contained in the original scope. One key element of the Re-Scope was to cease capital investment in the thermal drying/pelletization of the biosolids. The vice president of USFilter recognized that "[a]lthough [thermal drying] is a proven technology, we do not feel that this technology provides the City the optimum use of its financial resources." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 10). Without the thermal drying technology, the parties agreed to continue using "the City's state of the art biosolids thermal processors" and make "selected improvements to the biosolids processing systems." (Id.) This new strategy would "reduce the cost of the capital improvements ... by approximately $31 million, save approximately $2.1 million in operating costs over a 10 year period, and provide the opportunity to save approximately $9.8 million in natural gas costs over a 10 year period." (Id.)

In return for the reduction in capital investments, the City paid the Plaintiff a lump sum of over $5.6 million. The Re-Scope Agreement "avoid[ed] the need for USFilter to request an equitable adjustment to cover the additional costs that were incurred to repair and replace equipment unidentified in the RFP [during due diligence] which had deteriorated between the date of the RFP and the time of contract award (nearly a year and a half)." (Def.'s Mot. for Summ. J., Ex. 28). This seems crucial, because as early as March 2003, the Plaintiff had begun compiling a list of problems with WRC's that it wished to negotiate with the City. (Def.'s Mot. for Summ. J., Ex. 35). According to Robert Dohoney, "we were losing money dramatically. . . . it had a lot more expenses than we had predicted on maintenance issues." (Dohoney Dep. at 146). This is not to say that internal discussions within USFilter were unanimous: the vice president of USFilter Engineering & Construction worried that "if this is a request and we agree to it (voluntary), we may set ourselves up for less compensation or no compensation that may be available under a formal notice of suspension (involuntary)." (Def.'s Mot. for Summ. J., Ex. 37). The internal tension over the Re-Scope was predicted by Dohoney: "Because at the end of the day whether [Operations and Maintenance is] operating incinerators or dryers, I really don't care. . . . Now, the E&C group that's got that budgeted for . . . the next four years on their plan may have a different thought." (Dohoney Dep. at 147). In fact,

one of the Plaintiff's representatives testified that the "construction project was the . . . nuts and bolts of the job." (Eddlemon Dep. at 88); (Muirhead Dep. at 176-77) ("When you suspend commercial thermal drying/pelletization process with 30-year-old incinerators, the entire long-term viable plan was abandoned. And nobody on either side apparently on the reassessment had the understanding . . . to recognize the deficiency of a long-term strategy. . . .").

Even as the parties agreed on the general terms of the Re-Scope, there was a consensus among the parties that the Agreement would need to be modified for the Re-Scope to take effect. The Commissioner of the City's Department of Watershed Management wrote to the Plaintiff that "I am confirming that we have an agreement in principle to pursue an amendment to the existing contract." (Def.'s Mot. for Summ. J., Ex. 26). Yet after the agreement in principle, the evidence is that the parties never followed through with intended "mark ups" of the Re-Scope to be presented to the City Council (although the City claims that it had no suggested changes). (Pl.'s Mot. for Partial Summ. J., at 18). In an internal memorandum dated June 8, 2005, Chris Staud, the City's Operations Biosolids Watershed Manager, opined that the Agreement was never formally amended because "[t]he Written Rescope was drafted up and ended up on someone's desk downtown and was never voted on by City Council." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 9). Stewart McKenzie

feared that legislative approval would be "arduous" because reversion to incineration would be a political hot potato. (Def.'s Mot. for Summ. J., Ex. 32, at 2). The Plaintiff anticipated the contract to be formally amended "no earlier" than the end of April 2004. (Id.)

Without a formal contract amendment (and even apparently without a final "mark up"), the parties moved forward and operated under the Re-Scope. In a letter dated June 13, 2005, from Jeffrey Kowal, a Vice President of Veolia Water North America, Kowal noted that "[i]n December 2003, we completed the negotiations of the new scope of work and the Fixed Design/Build Price. At the City's request, we submitted our revised construction schedule to complete the re-scoped activities. . . . The City accepted our re-scoped schedule [of values] as submitted." (Def.'s Mot. for Summ. J., Ex. 31, at 1). The parties agree that the Plaintiff performed over $16 million in "capital work" under the Re-Scope. (Muirhead Dep. at 286-87).

Late into 2005, and after the issuance of two more design/build suspensions of the original capital work, the City had still not modified the Agreement. In June 2005, the Plaintiff notified the City that it would formally request an adjustment to the design/build price. On October 7, 2005, Veolia sent the City a letter entitled: Amendment Agreement No. 1 - Change Order with Contract Changes to Reflect Existing Scope of Services for Long - Term Biosolids Management Services. In the

change order request, Veolia sought (among other things) to increase the Re-Scoped capital expenditures of over $29,638,000 by an additional $28,636,000. (Def.'s Mot. for Summ. J., Ex. 30, at 12). The total capital expenditures sought would have totaled nearly $58,275,000; the original capital expenditures in the Agreement were less than $54 million. (Id.) The City responded on December 7, 2005. Robert Hunter, the Commissioner of Watershed Management at that time, disputed the need for increased capital expenditures and refused to "[acknowledge] the validity or potential validity of the submitted change order." (Def.'s Mot. for Summ. J., Ex. 29, at 7). Further, Commissioner Hunter's letter declared Veolia to be in default of the Agreement. (Id.) Veolia responded by sending notice of its intent to terminate the Agreement and file suit. The City then terminated the Agreement on July 10, 2006. The Plaintiff filed this lawsuit on June 19, 2006, alleging that the City had breached the Agreement. In its Amended Complaint, the Plaintiff sought damages for breach of contract and also under quantum meruit. The parties have now filed cross-motions for summary judgment and various other motions.

## II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

III. Discussion

A.  Breach of Contract

The Plaintiff alleges that the City breached the Agreement by not compensating the Plaintiff for the additional costs incurred due to the deterioration of the waste water management facilities between the time of the RFP and execution of the contract. The City argues that any claims based on "material unforeseen and unanticipated conditions" should be barred because the Plaintiff agreed to take over the facilities "as-is" under Section 5.04 of the Agreement. The Plaintiff argues that the City should not be able to "hide behind" the as-is provisions, considering that the City paid over $5.6 million as part of the Re-Scope to compensate for unforeseen conditions.

The Plaintiff's argument misses the point. First, the Plaintiff saw the Re-Scope negotiations as a way to make whole its Operations and Maintenance Division for losses it was sustaining. More specifically, significant losses were due to "misses" on the Plaintiff's part during its due diligence of City facilities. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., Ex. A). Further, the Plaintiff re-negotiated a schedule of values as part of the Re-Scope. As previously noted, the Plaintiff admitted that the Re-Scope "avoid[ed] the need for USFilter to request an equitable adjustment to cover the additional costs that were incurred to repair and replace equipment unidentified in the RFP [during due diligence] which had deteriorated between the date of the RFP and the time of contract award (nearly a year and a half)." (Def.'s Mot. for Summ. J., Ex. 28). After it took over operations, the conditions were neither unforeseen nor unanticipated and it should have accounted for the conditions in its negotiations of a revised values schedule. In essence, the Plaintiff has already squandered two opportunities (the Agreement and the Re-Scope) to negotiate a viable arrangement for its operation of the facilities.

The City also argues the Plaintiff's breach of contract claims were waived because the Plaintiff failed to follow mandatory claim procedures. Section 20.07 states that:

> No claim by the Contractor against the City for additional compensation . . . shall be valid unless a notice of claim is filed with the City within ten

> (10) days after occurrence of the event upon which the claim is based, and, in addition, unless a detailed written statement of the claim, accompanied by [documentation], shall have been filed with the City by the Contractor within thirty (30) days after the occurrence of said event.

Id. Under Section 20.07, the Plaintiff's failure to follow the procedure's time lines materially prejudices the City's interests and absolutely waives the claim "and the right to file or thereafter prosecute the [claim.]" Id. In its Complaint, the Plaintiff alleges that, presumably throughout the life of the Agreement, it "continued to demand payment for its ever increasing costs of Design Build Improvements, repairs, replacement work, operation and work beyond the scope of the Agreement [caused by] the City's actions and unforeseen and unanticipated conditions." (Second Amended Compl. ¶ 33). However, in its briefing, the Plaintiff does not suggest that it followed the claim procedures but rather provides several reasons why it should be excused from them. First, the Plaintiff argues that Section 20.07 is inapplicable because its claims for damages did not arise out of any "event" but rather the condition of the equipment itself. A plain reading of the Agreement renders this argument unavailing. Section 20.07 covers all claims "related to the Biosolids Management Services." Second, even supposing there was not a discrete event for the Plaintiff to point to, it claims that the facilities were substandard from the outset. The Plaintiff alleges in its Complaint that it "learned it was faced with numerous material and unforeseen and unanticipated conditions" the day it took over operations. (Second

Amended Compl. ¶ 17). Internally, the Plaintiff was drafting a change order request based upon "uncontrollable circumstances" and "misses" as early as March 2003. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., Ex. A). The Plaintiff next argues that it should be exempt from the claims procedures because the City either had actual knowledge of derelict conditions or waived the notice provisions altogether. Under Georgia law, notice requirements are to be "reasonably construed." Department of Transportation v. Dalton Paving & Construction, Inc., 227 Ga. App. 207, 215 (1997). The "key issue" is whether the Defendant had "actual notice" of the Plaintiff's claims. Id. There are competing policy claims in the enforcement of claims procedures. On the one hand, the law disfavors "forfeitures due to noncompliance with contract provisions." Id. Simultaneously, courts are wary to render the specific contractual terms "meaningless and superfluous" by finding actual knowledge to be sufficient for complying with claims procedure. Department of Transportation v. Fru-Con Construction Corp., 206 Ga. App. 821, 824 (1992). Importantly, a waiver only exists if the defendant performed "any affirmative act" which would lead the plaintiff to believe it need not provide a timely notice of a claim. Id. In this case, there is evidence that the City had actual notice of the project's problems that culminated in the Re-Scope. Indeed, the Re-Scope is arguably an "affirmative act" providing evidence that the City waived the time limitations of the notice procedure for

problems before the Re-Scope was agreed to in December 2003. Even supposing this to be the case, however, I agree with the City that the Re-Scope did not "negate Veolia's obligation to comply with the notice and claim provisions throughout the rest of the term of the Agreement." (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 23). Although the parties had negotiated the Re-Scope in part out of recognition of the Plaintiff's increased costs, the fact is that the Plaintiff did not formally notify the City of the extent of its post-Re-Scope costs from the time of the agreement in principle in December 2003 until the Plaintiff requested a change order in June 2005. By that time, the Plaintiff claimed contract costs against the City that exceeded the original Agreement by $24 million, despite the fact that the Re-Scope was intended to reduce the contract costs to the City. (Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 19). It is difficult to conceive how a good-faith payment of $5.6 million (from the Re-Scope) waived all rights of the City to be formally notified of damages exceeding $24 million. Accordingly, the City is entitled to summary judgment as to the Plaintiff's breach of contract damages claims. All other breach of contract claims were abandoned by not being addressed in response to the City's motion.

    B. <u>Quantum Meruit Claims</u>

The Plaintiff also seeks $25,000,000 in damages under a theory of quantum meruit. A quantum meruit recovery is not allowed when the claim is the subject

matter of an express contract between the parties. Kwickie/Flash Foods, Inc. v. Lakeside Petroleum, Inc., 246 Ga. App. 729, 730 (2000). If "there is no specific contract or the contract agreed to is repudiated by both parties, an action sounding in quantum meruit will lie for whatever work was done and accepted." Stowers v. Hall, 159 Ga. App. 501, 502 (1981). In this case, the Agreement and what the parties refer to as the Re-Scope were express agreements specifying the work to be performed by Plaintiff and the compensation to be paid by the City. Under the latter agreement, the Plaintiff was to be paid $33 million for performance of specific items of work identified in a Revised Schedule of Values. It also was to receive increased operational fees and a one-time payment of $5.69 million for past costs incurred. The Plaintiff submitted pay requests based on the Revised Schedule of Values and the increased operational fees. These pay requests were paid by the City.

The Plaintiff argues that it is entitled to a quantum meruit recovery because the Re-Scope was never formally adopted. Any work done under the Revised Schedule of Values under the Re-Scope was outside the Agreement; therefore, the Plaintiff argues, the City abandoned the Agreement. It is undisputed that the parties reached an agreement in principle concerning the Re-Scope in December 2003, and both parties agree that the Plaintiff performed work enumerated by the Re-Scope. The City argues that the Re-Scope was a valid contractual modification under Article 12 of the

Agreement. Section 12.01(E) of the Agreement specifies three ways to make changes in the design/build work: "Any deletion from or addition or change to the Design/Build Work . . . directed by the City, shall be a Construction Change Directive and handled pursuant to Section 12.10 hereof, a [Construction Incentive Change Proposal] and handled pursuant to Section 12.11 hereof, or considered to be a Capital Modification and handled in the manner provided in Article 14." The City claims that the Re-Scope was a Construction Change Directive under Section 12.10. A Construction Change Directive is defined in the Agreement as "a change to the details of the Design/Build Work issued by the City." This definition is reflected in the procedure for Construction Change Directives in Section 12.10: "The City may, at any time, make changes in the details of the Design/Build Work by issuance of a Construction Change Directive. Upon receipt of such a Construction Change Directive, the Contractor shall proceed . . . in the same manner as if such Construction Change Directive were originally included in this Agreement."

The Plaintiff argues at length that the Re-Scope Agreement was never formally adopted by submission to and approval by the Mayor and City Council. The City argues that Section 2-1291 of its Code provided the City with the "unilateral right of the city to order in writing changes in work within the scope of the contract." ATLANTA, GA., CODE § 2-1291(1). The City possessed an additional unilateral right

"to order in writing temporary stopping of the work or delaying performance that does not alter the scope of the contract." Id. § 2-1291(2).

In the final analysis, it is unnecessary to delve into the quagmire of contractual technicalities to determine whether the Re-Scope Agreement was legally valid or enforceable in some abstract or theoretical sense. It is undisputed that for two years the parties acted as if it was a valid Construction Change Directive. For example, Jeffrey Kowal, a Vice President for the Plaintiff, began a June 2005 letter to the City by noting that "[i]n accordance with the Construction Change Directive issued by the City back in the summer of 2003, Veolia Water proceeded to work with the City to develop a revised Fixed Design/Build Price to complete the re-scoped repair and replacement activities as described by the City." (Def.'s Mot. for Summ. J., Ex. 31). It is immaterial that there is no "specific and discrete document" that identified the Re-Scope as a Construction Change Directive. The Plaintiff was paid millions of dollars for work that was performed according to its terms. The Plaintiff, having accepted the benefits of the Re-Scope Agreement, is estopped from denying its contractual and legal validity as between the Plaintiff and the Defendant. See Tri-State Elec. Co-op. v. City of Blue Ridge, 88 Ga. App. 717, 721-22 (1953). The same principle of estoppel prevents the Plaintiff from recovering under quantum meruit on the theory of a "cardinal change" in the contract. Neither the City nor the Plaintiff abandoned

the Agreement. Therefore, there is no basis for the Plaintiff to recover quantum meruit damages from the City.

IV. Conclusion

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 181] is GRANTED and the Plaintiff's Motion for Partial Summary Judgment [Doc. 172] is DENIED. The Plaintiff's claim for attorney fees is contingent upon its success on the merits. The Court declines to exercise jurisdiction as to the declaratory judgment claim. Accordingly, the Clerk should enter final judgment in favor of the Defendant.

SO ORDERED, this 8 day of December, 2008.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge