IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VEOLIA WATER NORTH AMERICA OPERATING SERVICES LLC, formerly known as U.S. Filter Operating Services, Inc.,<br><br>    Plaintiff,<br><br>        v.<br><br>CITY OF ATLANTA,<br><br>    Defendant. | <br><br><br><br><br>CIVIL ACTION FILE<br>NO. 1:06-CV-1457-TWT |

**OPINION AND ORDER**

**Table of Contents**

**Page**

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

II. Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    A.    The Water Reclamation Centers . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    B.    The Service Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        1.    Request for Proposals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        2.    Design/Build/Operate Provisions . . . . . . . . . . . . . . . . . . . . -6-
        3.    The As-Is Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        4.    The Notice and Claims Provisions . . . . . . . . . . . . . . . . . . . . -9-
    C.    Suspension of Pelletization and the Rescope Agreement . . . . . . . -10-
    D.    Veolia's Operation of the Facilities . . . . . . . . . . . . . . . . . . . . . . . -13-
    E.    Default and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    F.    The City's Claims Against Veolia . . . . . . . . . . . . . . . . . . . . . . . . -21-
        1.    Collapse of Digester Lids . . . . . . . . . . . . . . . . . . . . . . . . . -21-
            a.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
            b.    Cost of Lid Repairs . . . . . . . . . . . . . . . . . . . . . . -23-
            c.    Odor Abatement Chemicals . . . . . . . . . . . . . . . . . -26-
            d.    Synagro Belt Presses . . . . . . . . . . . . . . . . . . . . . . -27-
        2.    Equipment Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
        3.    Natural Gas Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-
        4.    Liquidated Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
        5.    Variport Mixing System . . . . . . . . . . . . . . . . . . . . . . . . . . -36-
        6.    South River Belt Press . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-
        7.    Overpayments for Sludge Dewatering . . . . . . . . . . . . . . . . -38-
        8.    Headhouse Roof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
        9.    Polymer System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
        10.    Double-Billing for Centrate . . . . . . . . . . . . . . . . . . . . . . . -42-
        11.    Salvage Value of Replaced Equipment . . . . . . . . . . . . . . . -44-
    G.    Veolia's Claims Against the City . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        1.    Unpaid Invoices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -46-
            a.    Undisputed Invoices . . . . . . . . . . . . . . . . . . . . . . -46-
            b.    Cost Savings Deductions . . . . . . . . . . . . . . . . . . . -46-
            c.    Natural Gas Deductions . . . . . . . . . . . . . . . . . . . . -48-

**Page**

    d. Phosphorus Offsets . . . . . . . . . . . . . . . . . . . . . . . . . -49-
    e. Headhouse Roof Work . . . . . . . . . . . . . . . . . . . . . . -49-
    f. Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-
    g. Utoy Creek Flood Damage Invoice . . . . . . . . . . . . -50-
    h. Invoice for "Stranded Work" . . . . . . . . . . . . . . . . . -50-
   2. Increased Operating Costs . . . . . . . . . . . . . . . . . . . . . . . . -52-
    a. January 2004 to August 2005 . . . . . . . . . . . . . . . . . -52-
     i. Centrifuge Maintenance . . . . . . . . . . . . . . . . . -52-
     ii. Incinerator Repair . . . . . . . . . . . . . . . . . . . . -55-
     iii. Digester 150 Roof . . . . . . . . . . . . . . . . . . . . . -56-
    b. August 2005 to July 2006 . . . . . . . . . . . . . . . . . . . . -57-
     i. Other costs . . . . . . . . . . . . . . . . . . . . . . . . . . -58-
    c. Digester Allowances From January to July 2006 . . -59-
    d. Extended Capital Oversight and
     Management Costs . . . . . . . . . . . . . . . . . . . . . . . . . -59-
   3. Letter of Credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-

III. Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -61-
  A. The Breach of Contract Claims . . . . . . . . . . . . . . . . . . . . . . . -61-
  B. The City's Negligence Claim . . . . . . . . . . . . . . . . . . . . . . . . . -62-
  C. The City's Bailment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-
  D. The As-Is Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-
  E. Claims Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-
  F. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -64-
  G. Contract Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-
  H. Mutual Mistake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-
  I. Voluntary Payment Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . -66-

IV. Summary of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -66-

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -68-

I.  <u>Introduction</u>

This case arises out of a contract dispute between the City of Atlanta and Veolia Water North America Operating Services, formerly known as U.S. Filter Operating Services, Inc., relating to the operation of the City's Water Reclamation Centers. Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law following a non-jury trial conducted from October 4 to October 18, 2010. The parties submitted their proposed Findings of Fact and Conclusions of Law on December 10, 2010.  The Court heard closing arguments on December 21, 2010.   The relationship between the City and Veolia ended in an acrimonious mess.  The myriad claims and counterclaims asserted in this lawsuit by both parties are more of the same.[1]

II.  <u>Findings of Fact</u>

A.     <u>The Water Reclamation Centers</u>

1.

The City processes wastewater and biosolids through four water reclamation centers (WRCs): RM Clayton, Utoy Creek, South River, and Intrenchment Creek.

---

[1]The parties submitted 394 pages of proposed findings of fact and conclusions of law.  Life is too short to attempt to address every argument thrown out by the parties.  I address here those issues and arguments that affect my ultimate findings of liability and damages.

Transcript at 65.

2.

There are two parts to the WRCs – the "wet" side and the "dry" side. Wastewater enters the wet side of the WRCs, where water filtering and purification occurs.  From the wet side, biological solids (also called biosolids or sludge) are concentrated and pumped to the dry side of the plants for further processing. Transcript at 67-69.

3.

On the dry side, the sludge is pumped into huge circular tanks called "digesters."  In the digesters, the volume of the sludge is reduced by anaerobic digestion.  Transcript at 67-69.

4.

From the digesters, the sludge is pumped into centrifuges for "dewatering." Dewatering produces a liquid stream called "centrate" and a relatively solid product called "cake."  The centrate is returned to the wet side of the plant for further treatment and is ultimately discharged into the Chattahoochee River.  At the RM Clayton and Utoy Creek facilities, the cake travels from the centrifuges on conveyor belts to incinerators, where it is burned, producing ash that is hauled to landfill for disposal.  Transcript at 67-69, 1286-98.

B.     <u>The Service Agreement</u>

     1.     <u>Request for Proposals</u>

5.

By the late 1990s, incineration had become politically unpopular.  In April 2001, the City issued a Request for Proposals asking qualified responders to propose a method of "beneficial re-use" to replace incineration. Transcript at 142.

6.

Veolia (then known as US Filter) submitted a technical proposal in October 2001.  It proposed that the City install thermal dryers that would convert the cake into fertilizer pellets.  Def.'s Ex. 611.

7.

The City awarded Veolia the contract.  Veolia and the City executed a Service Agreement in August 2002 incorporating Veolia's October 2001 technical proposal. Joint Ex. 20.

     2.     <u>Design/Build/Operate Provisions</u>

8.

Under the Service Agreement, Veolia was to install new thermal dryers and repair certain existing equipment.  The cost of these capital improvements was approximately $53.5 million.  Transcript at 88.

9.

The $53.5 million included $4.3 million in allowances, including $3.45 million

for the cleaning, inspection, and repair of the digesters.  Def.'s Ex. 42, Appendix 20

("Allowance Items"). Allowances are basically "place holders" for work that is to be

performed, but for which the cost cannot be identified.  The Service Agreement

provided that the City would issue a change order authorizing additional funds if the

allowances did not cover the contractor's actual expenditures on this work.  Def.'s Ex.

42, Appendix 20 at § 20.1; Transcript at 420, 1032-33.

10.

In addition to performing the capital work, Veolia was to operate the dry side

of the WRCs for a ten-year term, with two possible five-year extensions.  For this

work, Veolia was to receive a fixed monthly operating fee, plus a variable fee that

depended on the volume of sludge processed that month.  Transcript at 79; Joint Ex.

20 §§ 11.01 & 11.03.

### 3.    The As-Is Provision

11.

The Service Agreement contained an as-is provision that shifted the risk-of-loss

from unforeseen equipment conditions from the City to Veolia.  Section 5.04(B) of

the Service Agreement provides:

The City makes no representation or warranty with respect to the Existing Facilities or the Sites. Based on its review of the design drawings, plans and specifications pertaining to the Existing Facilities, its inspections of the Existing Facilities and the Sites and other inquiries and investigations made by the Contractor prior to the Contract Date, which the Contractor acknowledges to be sufficient for this purpose, the Contractor assumes the risk of the adequacy and sufficiency of the design of the Existing Facilities and the existing, "as is" condition of the Existing Facilities and the Sites as such design or condition may affect the ability of the Contractor to comply with Applicable Law, meet the Contract standards and the Performance Guarantees, design and construct the Design/Build Improvements, meet its maintenance, repair and replacement obligations and perform any of its other obligations hereunder (including responding to and satisfying any third-party complaints and/or claims with respect to all aspects of the Biosolids Management Services, including those relating to portions of the Biosolids Management Facilities with respect to which the Contractor has not yet undertaken any improvement, maintenance, repair, replacement or other activity) upon the schedule and for the compensation provided for herein. The Contractor agrees that any latent or patent defect, flaw, error, inoperability, inadequacy or other condition or aspect of the design or existing condition of the Existing Facilities of the Sites that exists as of the Contract Date or that may be revealed during the performance hereof shall not be an Uncontrollable Circumstance.

Joint Ex. 20 § 5.04(B).

### 12.

Because the as-is provision placed the risk-of-loss from unforeseen equipment conditions on the contractor, Veolia was given the opportunity to conduct due diligence on the WRCs prior to submitting its proposals.  For example, there was an extensive "data room."  The information in the data room included historical

operational data and design documents for the four WRCs. In addition, the City held informational conferences that Veolia and the other proposers could attend. The City also held guided tours of the WRCs, and Veolia and the other proposers were allowed to schedule additional visits to the WRCs.  The proposers could also submit written questions to receive further clarification about the scope of the project.  Transcript at 82-83, 577-580; Joint Ex. 2 at pp. 25-27; Joint Ex. 3; City Ex. 6; Stipulated Facts Nos. 6, 7.

4.     The Notice and Claims Provisions

13.

The Service Agreement also contained several provisions governing claims for additional compensation.

14.

Section 18.02 governs claims for additional compensation based on "Uncontrollable Circumstances," including the delivery of off-specification biosolids by the City.  It requires the party seeking to assert an "Uncontrollable Circumstance" to provide notice of the relevant event "on or promptly after the Party . . . first knew of the commencement thereof, followed within five (5) days by a written description" of the event and its consequences.  Joint Ex. 20 § 18.02.

15.

Section 12.04 governs claims for additional compensation based on the City's delay, suspension, or interruption of the capital work.  It requires Veolia to provide notice of its claim within ten days after the termination of the suspension, delay, or interruption.  Joint Ex. 20 § 12.04.

16.

Finally, Section 20.07 governs general claims by Veolia for additional compensation.   It requires Veolia to notify the City within ten days after the occurrence of the event on which the claim is based and to provide supporting documentation within thirty days.  Joint Ex. 20 § 20.07.

C.      Suspension of Pelletization and the Rescope Agreement

17.

Veolia assumed operational control over the dry side of the WRCs in December 2002.  At this time, the City was in financial turmoil.  Transcript at 144.

18.

In April 2003, the City notified Veolia that it was suspending the work associated with the design and construction of the pelletization facilities because funding was not available.  Transcript at 105, 149-50, 428-30; Joint Ex. 55.  The notice announced an initial suspension of 180 days, but that suspension was extended

and remained in place through the termination of the parties' relationship in July 2006. Transcript at 96, 157.

19.

After the City suspended the pelletization work, the City and Veolia engaged in an eight-month negotiation in an effort to redefine the capital improvement work that Veolia would undertake on the biosolids portions of the City's WRCs. Transcript at 147, 1209-18, 1766-67.  The parties described that process and the agreements that were reached as the "Rescope."

20.

By December 2003, the parties had reached an agreement on the revised scope of capital work Veolia was to perform and the amount that Veolia was to be paid for that work.  Transcript at 1229.  Both parties acknowledge that there was no document formally amending the terms and conditions of the Service Agreement.  However, the parties performed under the Rescope as if it were a formal amendment to the Service Agreement.  The Rescope was sufficiently definite to be enforceable.

21.

The items of capital work and the agreed price for that work were set forth in a "revised schedule of values" created by Veolia and used in connection with its applications for payment for capital work during 2004 and 2005.  Transcript at 318,

321-28; City Ex. 546.   The total cost for the Rescope was approximately $33.6 million. Joint Ex. 81 at 13.  This included a $5,694,506 payment to Veolia to cover costs incurred due to unforeseen conditions at the WRCs and for sunk costs associated with the pelletizer proposal.  Transcript at 126-127, 323; Joint Ex. 81 at 13.

22.

The parties disagree about the schedule on which the Rescope work was to be performed.   Veolia says that the parties agreed to an eighteen-month construction schedule beginning on February 2, 2004, and that its agreement on pricing was contingent on being able to perform the work according to that schedule.  Transcript at 1771-72.

23.

The City says that it agreed to provide $18 million in funding for capital work in 2003 and 2004 and an additional $16.9 million for capital work in 2005, and that the schedule was dependent on the City's ability to fund the capital work based on these amounts.  The City also says that there was an agreement on how much capital work could be funded at each of the WRCs each year, which meant that not all of the capital work agreed to under the Rescope could be completed in eighteen months. Transcript at 1523-24, 1826-32.

24.

The Court finds that the preponderance of the evidence supports Veolia's position.  First, the evidence shows that the City and Veolia conducted a partnering session on January 28, 2004, to discuss a formal modification of the Service Agreement.  Together the parties documented three steps to finalize the contract modification.  The first was to "[d]evelop a cost loaded schedule that includes all first-year work and re-scope work . . . us[ing] an 18 month schedule and February 2, 2004, as the start date."  Joint Ex. 89 at 5.

25.

Second, the evidence shows that Veolia submitted the cost-loaded eighteen-month schedule shortly after the partnering schedule.  Joint Ex. 94.  Under the schedule, all of the Rescope work would have been completed by August 2005.  Former Veolia employees Mike Grumet and Jeffrey Kowal both testified that the City approved this schedule.  Transcript at 1231-33, 1773, 1783-85; Joint Ex. 94.

D.    Veolia's Operation of the Facilities

26.

Veolia was scheduled to begin Rescope capital work in February 2004.  Shortly thereafter, the parties' relationship began to break down.  They could not agree upon changes to the original Service Agreement.

27.

Veolia says that the City failed to provide adequate funding to clean the digesters.  The City complains that Veolia operated the digesters in such a manner as to collapse two digester lids. RM Clayton has four, 125-foot diameter digesters (D100, D150, D200 and D250).  The digesters consist of large concrete tanks covered by lids, with flat bottoms and domed roofs  The lids float on top of the sludge. When the sludge drops below a certain point, the lids rest on concrete supports called corbels which extend into the digester tank from the interior walls.  Transcript at 1410-11.

28.

Over time, foreign material, including sand, rocks, wood, rags, plastics, and other non-digestible debris, accumulates in the bottom of the digesters and reduces their useful capacity.  Therefore, digesters should be emptied and cleaned at least every five years.  Transcript at 1030, 1379-80.

29.

When Veolia assumed control, the digesters had not been cleaned for a long time, perhaps for decades.  Def.'s Ex. 78.  Moreover, by the second year of Veolia's operations, the four RM Clayton digesters had reached the end of their expected useful service lives.  Transcript at 944-45; City Ex. 381; City Ex. 375A2 at 34-37.

30.

Veolia initially met with the City in February 2003 to plan digester cleaning work.  The City and Veolia agreed on a request for proposals (RFP) for digester cleaning.  The RFP specified a fixed quantity of material to be removed "so that all of [the] bidders would be developing their unit prices using the same calculated quantities."  Transcript at 1035.  Bidders were to assume that the material to be removed would start at the top of the inverted cone that forms the bottom of the digester tank.  Transcript at 1427; Joint Ex. 252 at 9.  However, as Mr. Bush acknowledged, no one knew during the proposal process how much material would actually have to be removed from the digesters.  Transcript at 1037.  Therefore, the digester cleaning proposal and contract documents provided that the cleaning subcontractor, Veolia, and the City would take joint measurements in each digester after it was pumped down to determine the actual elevations of material to be removed.  Transcript at 1033-39. The parties would then arrive at a final lump-sum contract price by multiplying the unit price from the successful bid times the actual cubic yards of material found in the digester.  Transcript at 1039.

31.

Synagro was awarded the digester cleaning contract in June 2003. It was set to start cleaning digesters at Utoy Creek and RM Clayton in September 2003. Transcript

at 1386-87.

32.

Synagro started work at Utoy Creek as scheduled.  Transcript at 1388; Def.'s Ex. 580i; Def.'s Ex. 580u. But the City did not allow Synagro to proceed at RM Clayton.  Transcript at 1389.  As contemplated by the RFP, the parties measured the actual elevation of material to be removed during cleaning.  They found a high volume of foreign material rising some 16 to 20 feet above the cone.  Id.

33.

The City decided to wait to clean the digesters until Veolia installed new "J-Spin" dewatering centrifuges.  It hoped that the centrifuges would help reduce the tank levels and lower the cleaning costs.  Transcript at 1389-91.  This was typical of the City's wishful thinking in the face of unpleasant realities.  Under the new plan, digester cleaning was to begin in February 2, 2004.  Transcript at 1389-90; Def.'s Ex. 580u at 1.  However, as usual funding problems caused further delays.

34.

In July or August 2004, the City finally allocated funds for digester cleaning. By October 2004, Synagro had emptied and cleaned Digester 150.  Transcript at 1401.

35.

An inspection around that time showed that the Digester 150 roof and lid needed work.  Transcript at 1401-06.  The City authorized the roof work in February 2005.  Transcript at 386-87.  However, by that time, Digester 150 was back in service, and the roof work could not be completed.

36.

In Spring 2005, digester capacity became an increasingly serious problem.  By March, Digesters 100, 150, and 200 were each full beyond the safe operating threshold of 95%, and Digester 250 was at 94.1% capacity.  Transcript at 1409-13.  According to Timothy Muirhead of Veolia, heavy rains in mid-March exacerbated the problem.  Plant records show that all of the RM Clayton digesters operated between 95% and 100% capacity every day between March 17 and April 8. Def.'s Ex. 649w; Transcript at 1415.

37.

The evidence shows that sludge overwhelmed the capacity of Digester 150 around that time.  Transcript at 1416-20.  Veolia allowed sludge to enter the attic area of the lid. On the morning of April 8, 2005, the lid collapsed and sank into the tank.

38.

With  Digester  150  out  of  service,  digester  capacity  remained  a  problem

throughout the year.  In December 2005, Digesters 100 and 200 were over 95% full and Digester 250 was over 90% full.  Def.'s Ex. 649ff; Transcript at 1431-32.  By late December, the remaining digesters were between 96% and 98% full.  Id.

39.

The evidence shows that sludge overwhelmed the capacity of Digester 250 around that time.  Transcript at 1416-20.  On December 31, its lid collapsed and sank into the tank like the Digester 150 lid had done several months before.

E.      Default and Termination

40.

The parties' relationship continued to deteriorate during 2004 and 2005.  Veolia complains that the City failed to fund all of the Rescope capital work, improperly withheld payments, and regularly delivered off-specification biosolids containing grit and debris during this time period.  See Joint Ex. 172.  By the end of 2004, the City owed Veolia more than $6 million for work that had been done but not paid for.  The City made no payments to Veolia for operations invoices from November 2004 through November 2005.  The failure to pay Veolia for its operations and maintenance invoices was a material breach of the Service Agreement.  The City funded $13.5 million for capital work through July 2006 not the $33 million agreed to in the Rescope.  The City's failure to fund the capital improvements projects was a material

breach of the Rescope Agreement.

41.

On October 7, 2005, Veolia sent a letter to the City requesting $4,376,000 in outstanding operation and maintenance invoices and $2,408,940 for recovery of increased operation and maintenance expenses incurred between January 2004 and August 2004. Id. It is undisputed that the City simply failed to pay Veolia's operation and maintenance invoices for much of 2004 and 2005.  In addition, Veolia requested a $166,925 per month increase in Veolia's fixed operation and maintenance fee and a $66,225 per month increase in its capital overhead costs. Id. The City did not agree to these increases in Veolia's monthly fees.

42.

Mr. Muirhead and Commissioner Robert Hunter met the following month to discuss the October 7 letter.  Mr. Muirhead brought with him to that meeting a letter declaring the City in default for nonpayment.  Def.'s Ex. 644; Transcript at 1534-35. He testified that when he presented the letter, Mr. Hunter asked him to take it back, proposing instead that the parties work together equitably to resolve their issues. Transcript at 1535-38.

43.

On December 7, the City served Veolia with its own default letter.  It said that

Veolia breached the Service Agreement by (1) collapsing two digester lids at RM Clayton, (2) installing centrifuges that were not appropriate for the use to which they were put, (3) regularly allowing digesters at RM Clayton to overflow, (4) failing to provide proper staffing or personnel, (5) inaccurately reporting the quality of process water being returned to the head of the plant at RM Clayton, and (6) violating the City's emissions permits.

44.

From January to July 2006, the parties exchanged several letters raising and responding to various allegations of breaches and defaults, but they did not resolve any issues.  Transcript at 135.  At this point, both parties had breached the Service Agreement and/or the Rescope Agreement.

45.

Veolia sued the City on June 19, 2006, seeking payment on outstanding invoices, recovery of costs and damages, and other relief. In response, the City filed a counterclaim seeking damages for breach of contract and tortious conduct.  On July 10, 2006, the City terminated Veolia, forcing it off the site in a matter of hours.  Joint Ex. 217; Transcript at 246.

F.      The City's Claims Against Veolia

46.

The City says that it suffered $25,103,577.65 in damages from Veolia's breach of contract and tortious conduct (negligence and breach of duty as a bailee).  Its damages are broken down into several categories.  The Court addresses each category of damages and the corresponding allegations in turn.

1.      Collapse of Digester Lids

47.

The City claims $10,782,455.15 in damages arising from the collapse of the Digester 150 and 250 lids.  These damages are broken down into three categories: (1) costs associated with repair of the lids on Digesters 150 and 250; (2) costs for odor control chemicals that the City purchased to respond to the odor created by the exposed sludge in those digesters during the time repairs were being completed; and (3) costs for rental of belt presses to process sludge between the time the lids collapsed and when they were replaced.

a.      Causation

48.

As discussed above, the lids of Digesters 150 and 250 collapsed in 2005.  The City presented expert testimony from Kurt Heinrichs, a structural engineer, about the

cause of the lid collapses.

49.

Mr. Heinrichs opined that the lids on those two digesters collapsed because there was sludge in the attic space of the lids.  Transcript at 803-805.

50.

Mr. Heinrichs' opinion is based on a theoretical model that Mr. Heinrichs created using GT Strudl, a computer program that is commonly used by structural engineers to model structural systems.  Transcript at 770-773.

51.

Using that model, Mr. Heinrichs was able to determine the structural capacity of the steel system within the lids prior to their collapse and the lids' ability to withstand loads under different scenarios, including scenarios where there are various amounts of sludge inside the attic space of the lid.  Transcript at 785-86.

52.

Mr. Heinrichs was told by the City to assume that sludge existed in the attic space of the digester lids at the time they collapsed and that sludge was being pumped out of the tanks beneath the lids so that the load in the attic space was not supported by sludge in the tank.  Transcript at 780-81.  The City presented evidence supporting both assumptions.  Transcript at 715-18, 1670-71; Def.'s Exs. 244, 251.  Veolia

offered no evidence of an alternative explanation for the collapse of the digester lids.

53.

Based on this evidence, the Court finds as a matter of fact that the collapse of the digester lids was caused by the manner in which Veolia operated the digesters. Specifically, the Court finds that Veolia allowed the lids to become engulfed by sludge, that Veolia allowed sludge to flow into the attic space, that Veolia then pumped sludge out of the digester tanks beneath the lids without removing the sludge in the attic space, and that, as a result, the lids collapsed under the weight of the sludge in the attic space.

54.

Veolia says that it should not be held responsible for the collapse of the digester lids for a number of reasons.  The Court finds these reasons unpersuasive.

b.     Cost of Lid Repairs

55.

The City showed that the total cost of removing and replacing the digester lids was $6,249,602.00.  City Ex. 381.  It does not seek the full amount.

56.

First, the City acknowledges that the lids would have needed to be replaced soon.  Accordingly, it does not seek to recover the cost of labor associated with

replacing the lids (estimated by the contractor at 50% of the total costs).  Transcript at 950-951.

57.

Second, the City adjusted the costs it seeks to recover to account for the condition of the lids before they collapsed.  Transcript at 951-953; City Ex. 381.  To do so, it used the methodologies agreed to by the parties in the WASL provision of the original Service Agreement.  Transcript at 943-944; City Ex. 375A1 at 15-52; Joint Ex. 30.

58.

Because the digester lids were beyond their expected useful service life at the time of the collapse, they were deemed to have a remaining useful life of 3.2 years (ten percent of the original estimated useful service life).  City Ex. 375A1 at 26.  The remaining useful service life was further adjusted based on the condition of the lids at the time of their collapse.  The City estimated that the lids were in "Yellow" condition, which means that the lids were "generally in expected condition for [their] age" but had "issues or problems that [could] be corrected through specific maintenance activity."  Id. at 42.  That condition adjustment meant that the lids were deemed to have 85% of their remaining useful life, or 2.72 years.  2.72 years is 8.5% of the original expected useful life.  Accordingly, the City multiplied the direct cost

of materials by .085 to calculate its total damages.  Transcript at 951-953; City Ex.
381 at 3.

59.

There are some costs that the City says should be charged to Veolia without a
discount or reduction.  Specifically, the City says that Veolia should pay for the full
cost of mobilizing a crane to the repair site, removing the collapsed lids, and repairing
damage to the tanks as a result of the collapsed lids. According to the City, these costs
were incurred by the City as a direct result of the lids collapsing and would not have
been incurred if the lids were replaced during the normal operations.  Transcript at
954.  Veolia did not produce any evidence to the contrary.

60.

The City also says that it is entitled to recover the cost of cleaning Digester 150
because it had already paid to empty the digester once.  Transcript at 954-956; City
Ex. 381 at 1.  The City does not include the cost of cleaning Digester 250 in its
damages calculation because that digester had not been cleaned previously.  Transcript
at 956; City Ex. 381 at 2.

61.

Based on the evidence at trial, the Court finds that the damages the City seeks
to recover for the repairs of the collapsed lids on Digesters 150 and 250 are reasonable

and the direct and proximate result of the collapse of the lids.

c.   <u>Odor Abatement Chemicals</u>

62.

The City also seeks to recover $638,111 for odor abatement chemicals that it claims were necessary to control odors after the digester lids collapsed.  City Ex. 563; Transcript at 962-64, 1095-96.

63.

Veolia does not dispute that the City paid $638,111 for odor abatement chemicals.  Instead, it argues that the City could have sufficiently controlled the odors for less money.  Veolia showed that it successfully controlled all odors after the December 2005 digester lid collapse through its termination in July 2006 for approximately $20,000 in chemical costs, after installing a spray system.  Transcript at 1572-73; Def.'s Ex. 550.  The City's own documents show that this method and level of treatment were satisfactory.  Def.'s Ex. 343 at 2.

64.

In light of this evidence, the Court finds that $638,111 is not a reasonable measure of damages.  Instead, the Court finds that the City could have controlled the odors for $40,000 in chemical costs.

d.    Synagro Belt Presses

65.

The City seeks to recover over $9 million in rental fees it paid to Synagro for belt presses it operated at RM Clayton after Veolia's termination as an alleged consequence of the lid failures at Digesters 150 and 250.  City Ex. 563; Transcript at 957-59, 1089-99.  A belt press receives sludge directly from the digester, thereby bypassing the centrifuge system and the incinerators.  Transcript at 1090-91, 1571-72.  It is an alternative method of sludge processing and disposal that does not use centrifuge dewatering or incineration.  Id.

66.

The City operated the RM Clayton belt presses from July 2006 to August 2008.  Transcript at 958, 1089.  Veolia claims that the City failed to mitigate its damages by operating the belt presses for over two years after its termination.  The burden is on Veolia to show that the City could have reduced its damages, and Veolia did not present any evidence to allow the Court to reasonably estimate the amount by which the damages could have been mitigated.

67.

Veolia claims that the City avoided various operating costs by using the belt presses and bypassing the centrifuges and incinerators.  Transcript at 1091-92, 1571-

72.  The City contends that the cost savings were insignificant.  Veolia offers no evidence to the contrary.  I find that the cost savings were insignificant in relation to the cost of using the belt presses when the two digesters were inoperable and use of the centrifuges and incinerators was not practical.

68.

The damages calculation also includes the cost of hauling solid material from the belt presses to a landfill.  However, the City admits that it would have incurred these hauling charges even if it had been operating normally, using centrifuges and incinerators.  Transcript at 1092.

2.    Equipment Damages

69.

The City claims $9,493,266 in damages associated with the condition of the WRCs at Veolia's termination.  The City says that Veolia's failure to properly staff and maintain the facilities decreased the average service life of the equipment.

70.

The City's claim for equipment damages is governed by Article 7 of the Service Agreement, which provides:

> The obligations of the Contractor under this Article 7 are intended to assure that the Biosolids Management Facilities are fully, properly and regularly maintained, repaired and replaced in order to preserve their long-term reliability, durability, efficiency and efficacy and that, in any

event, the Biosolids Management Facilities are returned to the City at the end of the Term in a condition that does not require the City to undertake a significant overhaul in order to continue to provide reasonably priced and efficient Biosolids Management Services.

City Ex. 485 § 7.01(D).

71.

The Service Agreement established a specific method by which the condition of the WRCs should be assessed at the beginning and at the end of the contract term. That method involved the creation of a protocol that would be used to perform those assessments.   The protocol plan ("Protocol Plan") was developed by an outside engineering firm recommended by Veolia and approved by the City. At the end of that process, the parties executed a "Memorandum of Understanding" acknowledging the creation and acceptance of the Protocol Plan.  Transcript at 299-301; Joint Ex. 30.

72.

The Protocol Plan used the "weighted average service life" (WASL) of the equipment as a measure of value.  City Ex. 375A1 at 27.  Under the Contract, if the overall WASL of the WRCs at the end of the contract term was less than the overall WASL of the WRCs at the beginning of the contract term, the Contract contemplated that Veolia would, "at the election of the City, either remedy the deficiency or make a cash payment to the City sufficient to enable the City to remedy the deficiency." City Ex. 485 § 7.02(H).

73.

It is undisputed that the parties conducted the initial valuation – the "Baseline Asset Valuation" – in accordance with the contract requirements.  Transcript at 310-11; City Ex. 564.

74.

However, the Court finds that the City did not conduct the Final Asset Evaluation in accordance with the contract requirements.  Specifically, it did not use an independent evaluator.  Instead, it used Atlanta Services Group, which was a joint venture of the City's longtime consultant JJ&G and two other firms.  Def.'s Ex. 218, Transcript at 403.  These entities were already representing the City on the WRC improvement project at issue in this case and already providing litigation support in the City's dispute with Veolia, all before being engaged to conduct the final evaluation.

75.

Atlanta Services Group completed the Final WASL in Spring 2007. ASG's Final WASL concludes that the City's equipment, as a weighted average, lost 2.4 years of useful service life during the 3.6 years that Veolia operated the facilities. Transcript at 1144-45, City Ex. 413 at 1.  The City says this translates into a difference in value of $9,493,266.

76.

The City is not entitled to recover these damages for at least two reasons.  First, it did not use an independent evaluator approved by Veolia.  As noted above, ASG and JJ&G are not independent of the City.  Moreover, there was no evidence that Veolia ever approved of ASG or JJ&G as an independent evaluator or that the City ever asked Veolia to do so.

77.

Second, the City seeks the wrong measure of recovery.  Section 7.02 provides:

> In the event the final evaluation establishes a maintenance, repair and replacement deficiency under this Section 7.02, the Contractor shall, at the election of the City, either remedy the deficiency or make a cash payment to the City sufficient to enable the City to remedy the deficiency.

City Ex. 485 § 7.02(H).

78.

The City did not attempt to prove the cost of remedying the alleged deficiencies. Instead, it seeks the difference in value ($9,493,266) associated with the alleged loss of 2.4 years of useful service life.  City Ex. 563.

79.

The testimony at trial shows that the difference in value shown by the Final WASL and the cost of remedying that difference are very different.  Even if the Final WASL had been conducted perfectly according to the contract and even if it had

revealed "a maintenance, repair and replacement deficiency," the City offered no evidence of the amount of the "cash payment to the City sufficient to enable the City to remedy the deficiency." Therefore, the City may not recover for equipment damage under Article 7 of the Service Agreement.

### 3.   Natural Gas Charges

80.

The City also seeks to recover $1,774,434.48 it paid Veolia pursuant to a natural gas cost-savings agreement. City Ex. 563. The Service Agreement provided that the City would pay for Veolia's natural gas usage up to a "guaranteed utility usage rate." If Veolia used more than the guaranteed utility usage rate, it would pay for the extra. If Veolia used less than the guaranteed utility usage rate, the City and Veolia would split the savings. Joint Ex. 20 § 11.06.

81.

The Service Agreement listed the guaranteed utility usage rate as .7 decatherms ("dT") per dry weight ton. Joint Ex. 20 § 11.06; Def.'s Ex. 42 at A19-1 (Appendix 19). This number was based on Veolia's technical proposal. Transcript at 1574-78. The City provided Veolia with records demonstrating historical gas usage at the WRCs, and Veolia intended to propose a competitive usage rate based on this data. Id.

82.

Veolia says that it made a unit conversion error that caused it to understate its proposed gas usage rate by a magnitude of ten.  Transcript at 1574-78.  As a result, it proposed .7 dT per dry weight ton as the guaranteed rate instead of 7.0 dT per dry weight ton.  Transcript at 1577-78.

83.

The stated gas usage rate of .7 dT per dry weight ton is significantly below the historical usage rates provided by the City. For example, in 2002, the City's average gas usage rate for RM Clayton alone was 11.7 dT per dry weight ton – over 16 times greater than the .7 dT rate.  Transcript at 1574-75.

84.

Shortly after it began operations, Veolia told the City that the .7 dT rate reflected a unit conversion error and that the correct rate should be 7.0 dT. The City ultimately agreed, and from April of 2004 until late 2005, it billed and paid Veolia using the 7.0 dT rate.  Transcript at 1164-65.

85.

About eighteen months later, the City unilaterally switched back to the .7 dT usage rate.  Transcript at 1166-67. This occurred around the time that Veolia provided (but withdrew) its default letter.

86.

From then until termination, the City deducted $1,536,972.98 from its payments to Veolia while using the .7 dT usage rate that it had previously acknowledged was a mistake. City Ex. 475.

87.

The City now seeks an additional $1.774 million on top of these withholdings. This amount reflects the amount that Veolia would have paid for gas from April of 2004 through late 2005 if the parties had applied the .7 dT rate over that period.

88.

At trial, the City tried to show that the .7 dT rate was not a mistake.  Its efforts were unconvincing.  The Court agrees with Veolia that the .7 dT rate was a mutual mistake of fact.  Based on these facts and the applicable law set forth in the Court's Conclusions of Law, the City may not recover the $1,774,434.48 it paid Veolia based on the 7.0 dT rate.

4.    Liquidated Damages

89.

The City also claims $1,120,000 in liquidated damages for digester overflows at RM Clayton and Utoy Creek.  City Ex. 563.

90.

The Service Agreement provides for liquidated damages of $5,000 per day for the "[r]eturn to the WRCs of decanted or supernatant streams from the anaerobic digesters." Def.'s Ex. 42, Appendix 11, Item 15. This is the provision under which the City seeks to assess liquidated damages. Transcript at 1011-12.

91.

Supernating, also called decanting, is a procedure in which the operator allows the heavier solids in the digesters to settle to the bottom of the tank, leaving a clear liquid (called supernatant or decant) at the top. The liquid is then siphoned off and returned to the head of the plant. Transcript at 1161. The resulting supernatant stream contains concentrated phosphorous and other chemicals that could have a detrimental impact on the wet side of the WRCs. Id.

92.

It is undisputed that Veolia did not create decanted or supernatant streams at Utoy Creek or RM Clayton, the facilities at issue. Transcript at 1161-62, 1953.

93.

Although the liquidated-damages provision references "decanted or supernatant streams," the City contends that it applies to any return of sludge to the head of the plant, even if it is not a decanted or supernatant stream. Transcript at 1868-71, 1952-

53.  In support of its position, the City cites meeting minutes in which one of the topics was labeled "Digester Supernatant back to plant headworks," and a letter to Veolia concerning the assessment of liquidated damages never paid by Veolia. City Ex. 403.

94.

As addressed in Section III (Conclusions of Law), if the language of the Service Agreement is unambiguous, the Court must apply it as written.  Here, both parties agree that the terms "supernatant" and "decanted" have a specific meaning in the wastewater industry, and that Veolia did not return "supernatant" or "decanted" streams to the WRCs.  Transcript at 1161, 1578-79.

95.

Accordingly, the Court finds that the liquidated-damages provision concerning decanted or supernated streams does not apply here.  Even if Veolia caused or allowed the digesters to overflow, the City is not entitled to liquidated damages under this provision.

5.    <u>Variport Mixing System</u>

96.

The City claims $130,878 in damages representing the purchase price for a piece of equipment called a Variport Mixing System. City Ex. 563; Transcript at 897-

900.  A Variport is a hydraulic mixing system that circulates sludge within a digester.

Transcript at 898-99.  Veolia's technical proposal, accepted by the City, called for the

installation of Variports at Utoy Creek and South River.  Id.  Both sides' witnesses

acknowledged that a Variport can be installed in a digester only after the digester is

cleaned and emptied.  Transcript at 899-900, 1168.

97.

The City approved and paid for the South River Variport, but Veolia did not

install it because the digester was never cleaned and emptied.  Transcript at 899-900,

1167.  According to the City, Veolia concluded that it could not take that digester out

of service for cleaning because the other digester did not have sufficient capacity to

handle all of the incoming sludge.  Transcript at 899-900.

98.

The City does not dispute Veolia's judgment about the functional capacity of

the South River digesters.  Instead, it says that Veolia should have used a temporary

belt press to keep pace with the inflow while it shut down one of the digesters for

cleaning and installed the Variport.  Transcript at 900.  However, Veolia presented

evidence that it proposed that idea and that the City rejected it.  Transcript at 1237-38;

Def.'s Ex. 163.  Accordingly, the City is not entitled to damages.

99.

Moreover, the City cannot recover because it has not properly proved damages. The South River Variport remains on-site in the City's possession.  Transcript at 1168-69.  The City makes no attempt to account for and deduct the Variport's fair market value from its damages.  It cannot recover the full price of the Variport and keep the Variport, which it could install and use as contemplated in Veolia's technical proposal.

### 6.     South River Belt Press

The City also seeks over $965,000 in rental fees for a belt press it operated at South River after Veolia's termination. City Ex. 563; Transcript at 960-61. The City claims that this was necessary due to the condition of the sludge processing facilities at South River after Veolia left.  Id.  The City cannot identify any provision of the Service Agreement that authorizes it to claim these damages.

### 7.     Overpayments for Sludge Dewatering

100.

The City also seeks to recover $145,000 it paid Veolia to clean Digester 150 at RM Clayton.  City Ex. 563; Transcript at 964-70.

101.

The digester cleaning contract specified different unit prices for liquid sludge

that could be pumped out of the digester and for solid material that had to be removed by other means.  Transcript at 964-65.  Veolia billed the higher unit price for all material removed by its subcontractor, Synagro.  Id.

### 102.

The City says that Veolia should not have billed the higher unit price for any of the material above the top of the inverted cone.  However, the City did not show that any of the material above the top of the inverted cone was liquid sludge that could be pumped out of the digester.

### 103.

To the contrary, Mr. Bush personally signed off on the depth recording taken by the parties after Veolia pumped down Digester 150, which states that there was "no liquid level encountered."  Def.'s Ex. 686; Transcript at 1041-42.

### 104.

It appears that the City's claim is based on the material elevations assumed in the digester cleaning RFP.  However, the RFP included these assumptions to ensure consistent unit price bidding among subcontractors.  Transcript at 1035.  Mr. Bush acknowledged that these assumptions were subject to change based on depth readings taken by the subcontractor and approved by the City.  Transcript at 1037.

105.

Moreover, even if Veolia overcharged the City for sludge dewatering, the voluntary payment doctrine discussed in Section III (Conclusions of Law) bars any recovery of those charges by the City because it signed off on the depth reading taken by the parties and voluntarily paid the requested amount.

8.    Headhouse Roof

106.

The City also claims $49,400 in damages associated with Veolia's allegedly defective repairwork on the RM Clayton headhouse roof.  As part of the Rescope, Veolia replaced the roofing membrane of the headhouse between Digesters 100 and 150 at RM Clayton.  Transcript at 976, 1568.  The City says that the new roof does not drain properly.  City Ex. 563; Transcript at 975-77.

107.

Veolia's agreed scope of work did not include any structural work to the headhouse.  Instead, it was to install a new roofing membrane on top of the existing structure.  Transcript at 1568.  Mr. Muirhead testified that the drainage was caused by a structural defect, not the roofing membrane installed by Veolia.  Transcript at 1568.  Mr. Bush did not seem to disagree with this statement.  See Transcript at 1960.  Accordingly, the City is not entitled to damages, because it has not shown that

Veolia's work was improperly completed or that it caused any drainage problems.

        9.    <u>Polymer System</u>

108.

The City also claims $37,065 in damages associated with a polymer system replaced by Veolia.  City Ex. 563; Transcript at 971-72.  This amount represents the remaining useful life of a pre-existing "dry" polymer delivery system when it was removed by Veolia to make way for a new system.  <u>Id.</u>

109.

Veolia removed the original dry polymer system at RM Clayton and replaced it with a liquid polymer system.  Transcript at 971-72.  The liquid polymer system did not work as planned.  Mr. Muirhead testified that this was because the digesters were not cleaned as scheduled, which reduced the detention time of sludge in the digesters and, in turn, reduced the pH of the sludge to the point where it required a custom-made, dry polymer product.  Transcript at 1898.

110.

It is undisputed that Veolia paid for the new liquid system.  The parties disagree, however, on who paid for the new dry system.  Mr. Muirhead testified that Veolia paid for the new dry polymer system, and Mr. Bush testified that the City paid.  Neither side offered any other evidence of payment.  Transcript at 1567, 1899.

111.

If Veolia paid for the new dry system, the City cannot recover damages.  The evidence showed that the new system is more advanced and has a longer remaining service life.  Accordingly, any remaining value of the old system has been offset by the higher value of the new equipment.

112.

At best, the evidence on whether the City paid for the new system is in balance. Accordingly, the City cannot show by a preponderance of the evidence that it paid for the new system and is therefore entitled to the remaining value of the old system.

### 10.   Double-Billing for Centrate

The City also seeks to recover $48,364.83 in damages based on Veolia's alleged "double-billing" for centrate.  The City says that Veolia returned excess solids to the wet side of the RM Clayton facility. According to the City, those excess solids worked their way back through to the dry side, where they were again treated by Veolia at the City's expense.  Transcript at 1009-11.

113.

The original Service Agreement imposed certain performance guarantees on Veolia with respect to the centrate streams returning from the dewatering centrifuges to the wet side of the plant.  Def.'s Ex. 42 at A2-2.  These included a minimum

capture of 90% of the total solids from the sludge it received and dewatered.

114.

Veolia's monthly operating reports show that Veolia typically captured between 94% and 98% of solids.  Mr. Muirhead acknowledged seven instances in which the monthly average solids capture at an individual WRC dropped below 90%, with captures of 85% (in one month), 87% (in two months) and 89% (in four months).  Def.'s Ex. 649nn; Transcript at 1313-18.  This is out of the 168 "plant months" that Veolia operated (42 months times four plants).  Using the method that the City used in its reporting to EDP, there are only three such months out of 168 plant months.  Id.  Otherwise, however, Veolia exceeded the performance guarantees in the original Service Agreement according to its monthly operating reports.

115.

The City, however, says that Veolia's monthly operating reports are inaccurate.  Transcript at 1010-11.  Mr. Bush testified that independent samples taken by the City differed materially from the samples taken by Veolia.  Id.  The City calculated its damages based on its own samples.  Id.

116.

However, Mr. Bush seemed unsure of how and where the City's samples were taken, and the City provided no other evidence or documentation of these samples.

Transcript at 1011.  This is insufficient to show that Veolia's operating records are inaccurate.  Accordingly, the City is not entitled to damages for Veolia's alleged "double-billing" of centrate.

11.   <u>Salvage Value of Replaced Equipment</u>

117.

Finally, the City seeks $67,914 for the salvage value of equipment replaced by Veolia at the WRCs.  City Ex. 563; Transcript at 942-43.  Mr. Bush explained that this claim is based on Section 7.06 of the Service Agreement, which states:

> The Contractor may, at the direction of the City and to the extent permitted by applicable law, remove, dispose of and sell, in accordance with reasonable commercial standards and applicable law, equipment constituting part of the Biosolids Management Facilities that is unused or obsolete and no longer needed. All proceeds from any such sale, minus a fifty percent (50%) sales commission to the Contractor, shall be the property of the City.

Joint Ex. 20 § 7.06; Transcript at 942-43.  The City says that Veolia disposed of some equipment without selling it for salvage, and seeks what it claims would have been its share of the salvage sale, had it occurred.

118.

The parties dispute whether § 7.06 allows Veolia to dispose of equipment without selling it.  However, even if Veolia improperly disposed of certain equipment, the City has not produced sufficient evidence to show its damages with reasonable

certainty.  Mr. Bush testified that the replaced equipment could have been sold for 5 percent of its value, as its value was stated in the Baseline WASL evaluation. Transcript at 942.  But it failed to substantiate this assumption with evidence, or even to specify precisely what equipment was included in its analysis.  Without more, the Court cannot calculate its damages with reasonable certainty.  Therefore, as addressed in the Court's Conclusions of Law, the City may not recover on this claim.

      G.    <u>Veolia's Claims Against the City</u>

119.

Veolia says that the City breached their agreement by withholding amounts due under the contract, failing to adequately fund the Rescope capital work, and regularly delivering off-specification biosolids.

120.

Veolia seeks $22,627,110 in total damages.  These damages include: (1) $5,843,448 in unpaid invoices; (2) $7,258,358 in increased operating costs; and (3) $9,525,304 in funds seized under a letter of credit after Veolia's termination.  The Court addresses each category of damages in turn.

1.      Unpaid Invoices

a.      Undisputed Invoices

121.

The City admits that it owes Veolia $1,642,810.52.  This amount includes money owed for retainage on capital work, unpaid invoices, and offsets for phosphorus chemicals.

b.      Cost Savings Deductions

Veolia also seeks to recover $475,532 that the City deducted from Veolia's invoices based on an alleged cost-savings agreement.  The parties agree that the City initially promised to pay Veolia a fixed price for each task on the revised schedule of values.  Transcript at 1582-85, 1794-95, 1863-64, 1966-67.

122.

The City says that the City employee Jeff Acton and Veolia employee Mike Hilyer later agreed to a "cost-savings" agreement.  Under the agreement, if certain work was completed for less than the fixed amount on the schedule of values, the "apparent savings would be earmarked and placed into a retainer line item within [Veolia's] schedule of values which then could be used for subsequent improvements at the facility or to cover cost overruns on other projects within the re-scope." Transcript at 1924.  Mr. Bush admitted that this "was an attempt to change the way

payments were made" under the Rescope agreement.  Transcript at 1967-68.

123.

Veolia says that there was no cost-savings agreement.  Transcript at 1582-85, 1720-22, 1794-95.  Its witnesses testified that the City proposed such an agreement but that Veolia rejected the idea.  Id.

124.

The City did not show by a preponderance of the evidence that the parties agreed to the cost-savings deal.  First, Mr. Acton, who allegedly entered the agreement on behalf of the City, did not testify about it.  Instead, only Mr. Bush testified about the agreement.

125.

Second, the City offered no evidence that Mr. Acton or Mr. Hilyer was authorized to enter an agreement on behalf of their respective employers.

126.

Third, the documentary evidence produced by the City was unpersuasive.  The City offered only two documents - an internal email string between Veolia employees and an internal City memorandum prepared by Mr. Bush.  Joint Ex. 164; Def.'s Ex. 600.  The emails do not document any agreement.  Joint Ex. 164.  Instead, they show only that Veolia employees discussed the City's proposal.  Id.  Moreover, Mr. Bush's

memorandum is undated, and there is no evidence that any Veolia employee even saw it.  Transcript at 1925- 26; Def.'s Ex. 600.  This is not enough to show that the parties agreed to modify the Rescope's payment scheme.

127.

Veolia says that the City deducted $475,532 from Veolia's invoices based on this cost-savings agreement.  Transcript at 1721-22.  However, it appears that the City deducted only $459,723.90 from Veolia's invoices based on the cost-savings agreement.  Veolia says that the City deducted $88,597.37 from Pay Request 22, but the invoice shows that Veolia deducted $72,789.17 from this invoice based on the cost-savings agreement and $15,808 based on a previously invoiced charge.  Accordingly, Veolia is entitled to recover $459,723.90 on its cost-savings claim.

c.   Natural Gas Deductions

Veolia also seeks to recover $1,536,972.98 that the City deducted from Veolia's invoices based on the natural gas agreement.  As discussed above, the City withheld natural gas payments from Veolia's invoices beginning in late 2005, when it went back to using the .7 dT natural gas rate that the City had previously recognized was a mistake.  Transcript at 1585-86.  For the reasons discussed above, the City is not entitled to offset these charges, which are based on a rate that the City itself acknowledged was an error for over a year and a half.  Accordingly, Veolia is entitled

to recover this amount.

      d.     <u>Phosphorus Offsets</u>

Veolia also claims $376,704 in damages that the City deducted from Veolia's invoices for phosphorus treatment chemicals used by the City.  The City admits that it owes this amount to Veolia.  It is included in the $1,642,810.52 the City concedes it owes.

      e.     <u>Headhouse Roof Work</u>

Veolia also claims $126,625 in damages for work it performed to replace part of the headhouse roof.  As discussed above, Veolia replaced the membrane lining of the headhouse roof.  The City refused to pay for this work because it said that the roof leaked.  For the reasons discussed above, the Court finds that Veolia did not cause the roof to leak.  Accordingly, it is entitled to be paid for the work it performed on the headhouse roof.

      f.     <u>Interest</u>

128.

Veolia also seeks to recover $115,114 in accrued interest on unpaid amounts that the City deducted from Veolia's invoices.  Section 20.20 of the Service Agreement provides that the parties may recover interest on all amounts not paid when due.  The City does not dispute the amount of the claim.  It should be paid.

g.      Utoy Creek Flood Damage Invoice

Veolia also claims $59,623 in damages for costs associated with repairing flood damage at Utoy Creek.  Transcript at 1589; Def.'s Ex. 329.  Veolia submitted an invoice and a letter explaining the charges but was never paid for the work.  Id.  The City has offered no explanation why Veolia is not entitled to payment of this invoice.  Accordingly, Veolia is entitled to $59,623.

h.      Invoice for "Stranded Work"

129.

Veolia also seeks to recover $1,505,907 based on an invoice for what Veolia describes as "stranded work" it began under the Rescope.  Transcript at 1594-97; Def.'s Ex. 685.  This is capital work authorized by the Rescope and initiated by Veolia.  Id.  However, the City did not fully fund the work under the agreed schedule or allow Veolia to continue to the next milestone where it could submit a bill under the revised schedule of values.  Id.  According to Veolia, this invoice is based solely on the difference between the actual out-of-pocket costs incurred by Veolia on these projects in excess of the amounts already invoiced and paid by the City.  Transcript at 1595-97.  It does not include overhead or lost profit on the unpaid portion of the work.

130.

The City does not appear to dispute that Veolia incurred these costs.  Instead, it says that Veolia is not entitled to this amount because it did not comply with Sections 12.05 and 20.07 of the Service Agreement.

131.

Sections 12.05(G) and (H) require Veolia to submit certain documentation with each payment requisition.  Here, Veolia did not submit a requisition at all because it never reached the next payment milestone.  Accordingly, Sections 12.05(G) and (H) do not apply.  Moreover, the purpose of Sections 12.05(G) and (H) is to ensure that Veolia actually completed the work it seeks to be paid for.  As noted above, the City does not appear to dispute that Veolia actually completed the work.

132.

Section 20.07, which governs claims for additional compensation, does not apply either.  Veolia is seeking compensation originally contemplated under the Rescope - not an increase in fees or other form of additional compensation. Accordingly, Veolia may recover the costs it incurred to complete this work.

2.      Increased Operating Costs

a.      January 2004 to August 2005

133.

Veolia seeks to recover $2,408,940 in increased monthly operating costs it allegedly incurred between January 2004 and August 2005.  Veolia notified the City in its October 7, 2005 letter that it was requesting a lump-sum recovery of three types of costs: (1) $369,175 for centrifuge maintenance; (2) $1,111,045 for incinerator repairs; and (3) $928,720 for dewatering and emptying Digester 150 for repairs.

i.      Centrifuge Maintenance

134.

Veolia says that the condition of the grinders and the City's delivery of off-specification biosolids caused the centrifuges to break down more often than it anticipated.  It seeks a lump sum of $369,175 to cover maintenance and repair costs. The Court finds that Veolia is not entitled to these costs under the Service Agreement.

135.

With respect to the grinders, the Court finds that Veolia accepted the condition of the equipment "as-is."  Section 5.04(B) of the Service Agreement provides:

> The City makes no representation or warranty with respect to the Existing Facilities or the Sites. . . . [T]he contractor assumes the risk of the adequacy and sufficiency of the design of the Existing Facilities and the existing, "as is" condition of the Existing Facilities as such design or

> condition may affect the ability of the Contractor to . . . meet its
> maintenance, repair and replacement obligations . . . upon the schedule
> and for the compensation provided for herein.

City Ex. 485 § 5.04(B).  Therefore, it may not recover the costs it incurred to repair

the centrifuges from damage caused by worn-out grinders.

136.

Further, Veolia may not recover maintenance costs related to the condition of

the grinders because it did not provide proper notice to the City.  Veolia was required

to comply with the notice provisions set forth in Section 20.07 of the Service

Agreement for any claim for additional compensation. Section 20.07 provides:

> No claim by the Contractor against the City for additional compensation
> related to the Biosolids Management Services shall be valid unless a
> notice of claim is filed with the City within ten (10) days after occurrence
> of the event upon which the claim is based, and, in addition, unless a
> detailed written statement of the claim, accompanied by vouchers and
> other supporting data, shall have been filed with the City by the
> Contractor within thirty (30) days after the occurrence of said event.

City Ex. 485 § 20.07.  Veolia did not comply with these requirements, and therefore

may not recover these costs.

137.

Veolia argues that Section 12.04(G), not Section 20.07, applies.  The Court

disagrees.  Section 12.04(G) governs claims based on the City's unreasonable delay,

suspension, or interruption of the capital improvement work.  City Ex. 485 § 20.07.

However, Veolia has not shown how the City's delay in funding capital work affected the condition of the grinders.  Accordingly, the Court finds that Section 20.07 should apply.

138.

With respect to the delivery of off-specification biosolids, the evidence shows that this was primarily an issue at South River and Intrenchment Creek, which are not the focus of Veolia's $2,408,490 invoice.  <u>See</u> Joint Ex. 172 at 2 (invoice for problems "particularly at RM Clayton (RMC) and Utoy Creek (UC) WRCs"); Def.'s Ex. 649iii; Transcript at 1901-1902.  The evidence shows that the City delivered off-specification biosolids to Veolia less than 2% of the time at RM Clayton and less than 5% of the time at Utoy Creek.  Def.'s Ex. 649iii.  Accordingly, the Court finds that Veolia has not submitted sufficient evidence to show that off-specification biosolids caused the additional operational costs claimed by Veolia in Pay Request CO-1.

139.

Further, Veolia may not recover costs associated with the delivery of off-specification biosolids because it did not provide proper notice.  Section 6.09(C) of the Service Agreement allows Veolia to recover damages where its receipt of off-specification biosolids constitutes an "Uncontrollable Circumstance."   City Ex. 485 § 6.09(C).  Assuming that receipt of these off-specification biosolids constitutes an

Uncontrollable Circumstance, Article 18 of the Contract sets forth the specific steps Veolia must take to recover additional operational costs.  City Ex. 485 § 18.02.

140.

Mr. Bush testified that Veolia never said that it had incurred any specific costs due to off-specification biosolids until its October 7 letter.  Transcript at 1902-04.  Mr. Bush also testified that Veolia never submitted any documentation showing which days it received off-specification biosolids or how exactly it responded to the receipt of these biosolids.  Id.

141.

Based on this evidence, the Court finds that Veolia did not comply with the requirements of Section 6.09(C) and Article 18.  Accordingly, it may not recover these costs.

ii.    Incinerator Repair

142.

Veolia says that it paid $1,111,045 between January 2004 and August 2005 to maintain and repair the incinerators at RM Clayton and Utoy Creek.  The City said during the Rescope process that three out of four incinerators were refurbished and functional for long-term use.  According to Veolia, these incinerators were not adequately refurbished and required frequent maintenance and repair.  The fourth

incinerator was scheduled to be refurbished under the Rescope agreement.  The City issued a stop work order on the fourth incinerator in April 2006.

143.

With respect to the first three incinerators, the Court finds that Veolia accepted the condition of the equipment "as-is."  Accordingly, for the reasons addressed above, Section 5.04(B) of the Service Agreement bars recovery of additional maintenance costs based on the condition of the allegedly refurbished incinerators.

144.

With respect to the fourth, unrefurbished incinerator, the Court finds that Veolia did not submit adequate evidence to show if and to what extent the City's April 2006 stop work order affected its monthly operating costs.  Instead, it provided a single amount summarizing the alleged impact of all four incinerators on its monthly operating costs.  Without more, the Court cannot calculate damages with reasonable certainty.  Therefore, Veolia is not entitled to recover these costs.

iii.   <u>Digester 150 Roof</u>

145.

Veolia seeks $928,720 for costs incurred dewatering and emptying Digester 150 in preparation for repairs.  Veolia Exs. 550, 597, 675; Transcript at 1598-1599.  As set forth above, the Court finds that Veolia caused the Digester 150 lid to

collapse.  Accordingly, it may not recover these costs.

146.

Further, Veolia was required to comply with the claim procedures set forth in Section 20.07 of the Contract to any claim for additional compensation from the City. The Court finds as a matter of fact that Veolia did not submit documents or testimony sufficient to demonstrate that it complied with Section 20.07 with respect to Veolia's claim related to the digester allowance invoices.

b.    August 2005 to July 2006

147.

Veolia also seeks $1,750,365 in increased monthly operating costs it allegedly incurred between August 2005 and July 2006.  Joint Ex. 172.  Veolia notified the City in its October 7 letter that it was increasing its fixed monthly operating fee going forward to cover the increased costs documented in the letter.  Veolia invoiced these costs on a monthly basis.  The costs consist of: (1) $13,175 per month for centrifuge maintenance; (2) $29,400 per month for incinerator repairs; (3) $20,600 per month for digester cleaning; and (4) $103,750 per month for operation and maintenance labor, supplies, and overhead.  Joint Ex. 172.  Veolia cannot identify any provision of the Service Agreement or the Rescope Agreement that authorized it to unilaterally increase its monthly operating fees.

148.

Veolia did not submit enough evidence at trial to show if and how it actually

incurred these costs, and which, if any, provision of the Service Agreement applies to

their recovery.   Accordingly, it may not recover these costs.

i.      Other costs

149.

Veolia says that it should be paid an additional $103,750 per month for

operation and maintenance labor, supplies, and overhead.  Joint Ex. 172.  The October

7 letter explains:

> VWNA has experienced excess costs to handle and process biosolids for
> the City to ensure compliance of the WRCs with their wastewater
> effluent NPDES permits.  This has been continuously achieved, despite
> the many equipment problems and O&M challenges we have faced with
> the existing biosolids facilities.  However, the aggregate impacts of peak
> biosolids pumping, non-specification biosolids, excessive grit and
> inorganic solids loadings, delays in CMG approvals of existing
> equipment to be refurbished has all contributed to large economic losses
> for VWNA.  As such, we are requesting financial relief of $103,750 per
> month in fixed fee adjustment, effective September 2005 to make us
> whole with respect to the adverse impacts on our labor, subcontractors,
> supplies (i.e. polymer), overhead and business margin.

Joint Ex. 172.

150.

Again, Veolia did not submit enough evidence with respect to this claim to

show if and how it actually incurred these costs, and which, if any, provision of the

Service Agreement applies to their recovery.  Accordingly, Veolia may not recover these costs.

   c.  <u>Digester Allowances From January to July 2006</u>

151.

Veolia seeks $2,834,153 for costs incurred in relation to the collapse of the digester lids at RM Clayton.  Def.'s Exs. 550, 597, 675; Transcript at 1598-99.

152.

As set forth above, the Court finds that Veolia caused the digester lids to collapse.  Accordingly, it may not recover these costs.

   d.  <u>Extended Capital Oversight and Management Costs</u>

153.

Veolia also seeks $264,900 ($66,225 per month) for additional capital oversight and management costs it incurred between September 2005 and December 2005. Transcript at 1525-27; Joint Ex. 172; Def.'s Exs. 534, 679.  These costs are a continuation of Veolia's monthly overhead for mobilizing and maintaining construction personnel and resources to do the Rescope work. Veolia continued to maintain these resources after August 2005, when the Rescope work was supposed to be finished, through December 2005, after which it demobilized these personnel and resources on the assumption that the City would not fund additional capital work.

Transcript at 1525-27, 1591-92.

### 154.

The Court finds that Veolia would not have incurred these additional months of construction-related costs if the City had funded the Rescope capital work in eighteen months as agreed. As noted above, Veolia's witnesses testified (and City witnesses acknowledged, at least in principle) that a contractor's bid price assumes completion on the specified schedule and that it will tend to incur additional overhead costs if the work is delayed. Transcript at 437-38, 1771-72.

### 155.

Accordingly, Veolia is entitled to be made whole for the City's delay pursuant to Section 12.04(G) of the Service Agreement, which provides that "an equitable adjustment shall be made for any increase in the Contractor's costs of performance . . . necessarily caused by [an] unreasonable suspension, delay or interruption [of capital work by the City]." City Ex. 485 § 12.04(G).

3.   Letter of Credit

### 156.

Finally, Veolia seeks the return of $9,525,304 in funds seized by the City under a Letter of Credit after it terminated Veolia. The City acknowledges that it is holding these funds only as an offset against the damages that it anticipated proving at trial.

<u>See</u> City Ex. 563 (showing line item for Letter of Credit offset). Therefore, Veolia is entitled to the return of these funds.

III.   <u>Conclusions of Law</u>

A.   <u>The Breach of Contract Claims</u>

The City is entitled to prevail on its breach of contract claim for the collapse of the digester lids.  Allowing the lids to collapse was a violation of Veolia's obligation under Sections 7.01 and 7.08 of the Service Agreement to exercise due diligence to maintain the facilities in good working order and to prevent the loss or destruction of the facilities.  I am not persuaded by Veolia's attempt to shift the blame entirely to the City.  Veolia knew that the digesters were full and should have known that sludge was filling the attics.  Certainly after the collapse of the Digester 150 lid, Veolia knew the probable consequences of overfilling the digesters.

Veolia is entitled to prevail on its breach of contract claim for the City's failure to pay undisputed maintenance and operating fees and capital improvements approved and accepted by the City under the Rescope Agreement.  I find that the City failed to show by a preponderance of the evidence that Veolia breached the Service Agreement by: (1) its operational performance; (2) NPDES discharge permit compliance; (3) general maintenance of the WRCs; or (4) operation and maintenance of the incinerators.

B.     The City's Negligence Claim

The City also seeks to recover on a negligence theory.  A plaintiff in a breach of contract case has a negligence claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law.  E&M Construction Co., Inc. v. Bob, 115 Ga. App. 127 (1967).  Under Georgia law, a contractor has an independent duty "not to negligently and wrongfully injure and damage the property of another."  Id. at 128.  The City says that Veolia breached this duty by negligently causing the digester lids to collapse.  This may be the case.  However, the City has not shown that it is entitled to any damages for its negligence claim above those already awarded for its breach of contract claim.  As to the general operation of the WRCs, the City failed to present evidence of the standard of care.

C.     The City's Bailment Claim

The City also seeks to recover on a bailment theory.  Under Georgia law, a bailee is required to "exercise care and diligence to protect the thing bailed and to keep it safe."  O.C.G.A. § 44-12-43.  The City says that Veolia was a bailee of the WRC equipment and facilities.  The Court disagrees.  To create a bailment, the bailee must have "independent and exclusive" possession of the bailed property.  Buckley v. Colorado Min. Co., Inc., 163 Ga. App. 431, 432 (1982).  Here, the Agreement between the parties clearly provides:

> The parties agree that the City always shall have immediate access to the Biosolids Management Facilities, and no [Veolia] rule or procedure shall impede, impair or delay such access.

Agreement § 5.03(E).  Because the City was entitled to immediate access to the WRC facilities at any time, Veolia's possession was neither independent nor exclusive, and the City may not recover on a bailment theory.

In addition, a bailment arises from the bailor's transfer of custody of personal property, not real property, to the bailee.  Most, if not all, of the facilities and equipment at issue are structures and fixtures to real property that could not give rise to a bailment.  Accordingly, the City's bailment claim fails for this reason as well.

### D.   The As-Is Provision

Under Georgia law, it is well-settled that "as-is" provisions are enforceable and constitute a waiver of a party's claim for damages.  See Tahoe-Vinings v. Vinings Partners, 205 Ga. App. 829 (1992).  Here, Veolia assumed the risk of "the existing, 'as is' condition of the Existing Facilities."  City Ex. 485 § 5.04(B).  There being no evidence that the City and Veolia mutually agreed to vary or amend the "as is" provision from the Contract, the Court concludes as a matter of law that the "as is" provision remains enforceable.

### E.   Claims Provisions

Under Georgia law, provisions requiring notice of claims as a condition of later

maintaining such a claim are also enforceable. See Pillar Dev., Inc. v. Fuqua Constr. Co., 284 Ga. App. 858, 860 (2007) ("Where a contract contains provisions requiring written notice of a claim for breach, the failure to give notice as required or to show a waiver by the party entitled to notice is an independent bar to the maintenance of a successful cause of action on the contract.").

There being no evidence produced at trial that the City and Veolia mutually agreed to alter the disputes and claims provisions in the Contract or that the City waived those provisions, the Court concludes as a matter of law that Veolia was required to give notice of all claims in accordance with Articles 12, 18, and 20 of the Contract.

F.    Damages

Under Georgia law, the plaintiff must furnish the factfinder with enough evidence to allow him to calculate damages with reasonable certainty. Hospital Authority of Charlton County v. Bryant, 157 Ga. App. 330, 331 (1981). The amount of damages "cannot be left to speculation, conjecture and guesswork." Id. With respect to the amounts awarded herein, the parties' damages are calculated with reasonable certainty based upon the evidence produced at the trial. See Hinesville Bank v. Pony Express Courier Corp., 868 F.2d 1532 (11th Cir. 1989). Neither party explained their claims for prejudgment interest with sufficient clarity to determine

these claims with reasonable certainty.

G.    Contract Language

If the language of the Service Agreement is unambiguous, the Court must apply it as written.  Hunsinger v. Lockheed Corp., 192 Ga. App. 781 (1989); St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999).  As addressed in Section II(F)(4), the liquidated-damages provision addressing "decanted or supernatant streams" is unambiguous.  Accordingly, the Court declines to extend it to circumstances not involving decanted or supernatant streams.

H.    Mutual Mistake

Under Georgia law, contracts based upon a mutual mistake cannot be enforced.  O.C.G.A. § 13-5-4.  Rather, "[i]n all cases where the form of the conveyance or instrument is, by mutual mistake, contrary to the intention of the parties in their contract, equity will interfere to make it conform thereto."  Hall v. Hall, 303 Ga. App. 434, 436 n.2 (2010).  A mistake relievable in equity "is some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence."  Id.  Parties to a contract need not both admit that a mistake was made in order for the Court to find a mutual mistake.  Id.  As addressed in Sections II(F)(3) and II(G)(1)(c), the Court finds that the parties made a mutual mistake in specifying .7 dT as the guaranteed utility usage rate.  Accordingly, the City may not recover for

natural gas billed to Veolia based on this rate.

     I.     <u>Voluntary Payment Doctrine</u>

Under Georgia law, a party who voluntarily pays a claim where all facts are known may not recover the payment unless it was made as the result of fraud or the duress of immediate foreclosure.  O.C.G.A. § 13-1-13; <u>Pew v. One Buckhead Loop Condominium Ass'n</u>, 305 Ga. App. 456, 460-61 (2010).  "The party seeking to recover payment bears the burden of showing that the voluntary payment doctrine does not apply."  <u>Id.</u> at 461.  As addressed in Sections II(F)(7) and II(G)(1)(c), the Court finds that the City made voluntary payments when it paid the invoiced rate for sludge dewatering associated with Digester 150 at RM Clayton and when it paid Veolia for natural gas savings based on the 7.0 dT guarantee usage rate.  Accordingly, the voluntary payment doctrine precludes the City from recovering these amounts.

     IV.  <u>Summary of Damages</u>

In summary, the City proved beyond a preponderance of the evidence that it is entitled to the following damages:

| Type of Damages | Amount Awarded |
|---|---|
| Repair of Digester 150 | $593,430.73 |
| Repair of Digester 250 | $518,443.64 |
| D150 Sludge Dewatering Overcharge | $0.00 |

| | |
|---|---|
| RM Clayton Polymer System | $0.00 |
| Headhouse Roof | $0.00 |
| Odor Control Chemicals | $40,000 |
| Synagro Belt Presses at RM Clayton | $9,032,469.16 |
| Variport at South River | $0.00 |
| Synagro Belt Press at South River | $0.00 |
| Double Billing of Centrate at RM Clayton | $0.00 |
| Miscalculation of Gas Usage | $0.00 |
| Salvage Equipment | $0.00 |
| TOTAL | $10,184,343.53 |

Veolia proved by a preponderance of the evidence that it is entitled to the following damages:

| Type of Damages | Amount Awarded |
|---|---|
| Undisputed Invoices | $1,642,810.52 |
| Interest | $115,114 |
| Cost Recovery Deductions | $459,723.90 |
| Natural Gas Deductions | $1,536,972.98 |
| Headhouse Roof Work | $126,625.02 |
| Utoy Creek Flood Damage Work | $59,623 |
| Stranded Work | $1,505,907 |

| | |
|---|---|
| Increased monthly operating costs (8/05 - 7/06) | $0.00 |
| Increased monthly operating costs (1/04-8/05) | $0.00 |
| Digester Allowances | $0.00 |
| Extended Capital Oversight and Management Costs | $264,900 |
| Letter of Credit | $9,525,304 |
| TOTAL | $15,192,788.52 |

Veolia is entitled to a net recovery of $5 million.  I find that the City has not proven that Veolia acted in bad faith or was stubbornly litigious.  Because the City is not entitled to recover anything, its contractual claim for attorney fees and costs must fail.

## V.  Conclusion

For the reasons addressed above, the Clerk is directed to enter judgment in favor of Veolia in the amount of $5,008,444.99.

SO ORDERED, this 3 day of June, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge