IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VEOLIA WATER NORTH
AMERICA OPERATING SERVICES
LLC, formerly known as
U.S. Filter Operating Services, Inc.,

    Plaintiff,

      v.

CITY OF ATLANTA,

    Defendant.

CIVIL ACTION FILE
NO. 1:06-CV-1457-TWT

**ORDER AND OPINION**

This is an action for breach of contract.  It is before the Court on the Judgment of the Court of Appeals remanding the case for a hearing on the amount of costs avoided by the City when it used belt presses and recalculation of the prejudgment interest awards.

## I.  Introduction

The City of Atlanta processes wastewater and biosolids through four water reclamation centers (WRCs): RM Clayton, Utoy Creek, South River, and Intrenchment Creek. There are two parts to the WRCs – the "wet" side and the "dry" side.  Wastewater enters the wet side of the WRCs, where water filtering and

purification occurs.  From the wet side, biological solids (also called biosolids or sludge) are concentrated and pumped to the dry side of the plants for further processing.  On the dry side, the sludge is pumped into huge circular tanks called "digesters."  In the digesters, the volume of the sludge is reduced by anaerobic digestion. From the digesters, the sludge is pumped into centrifuges for "dewatering." Dewatering produces a liquid stream called "centrate" and a relatively solid product called "cake."  The centrate is returned to the wet side of the plant for further treatment and is ultimately discharged into the Chattahoochee River.  At the RM Clayton and Utoy Creek facilities, the cake travels from the centrifuges on conveyor belts to incinerators, where it is burned, producing ash that is hauled to landfill for disposal.

By the late 1990s, incineration had become politically unpopular.  In April 2001, the City issued a Request for Proposals asking qualified responders to propose a method of "beneficial re-use" to replace incineration. Veolia (then known as US Filter) submitted a technical proposal in October 2001.  It proposed that the City install thermal dryers that would convert the cake into fertilizer pellets.  The City awarded Veolia the contract.  Veolia and the City executed a Service Agreement in August 2002 incorporating Veolia's October 2001 technical proposal. Under the Service Agreement, Veolia was to install new thermal dryers and repair certain

existing equipment.  The cost of these capital improvements was approximately $53.5 million.  The $53.5 million included $4.3 million in allowances, including $3.45 million for the cleaning, inspection, and repair of the digesters. Allowances are basically "place holders" for work that is to be performed, but for which the cost cannot be identified.  The Service Agreement provided that the City would issue a change order authorizing additional funds if the allowances did not cover the contractor's actual expenditures on this work. In addition to performing the capital work, Veolia was to operate the dry side of the WRCs for a ten-year term, with two possible five-year extensions.  For this work, Veolia was to receive a fixed monthly operating fee, plus a variable fee that depended on the volume of sludge processed that month.

Veolia assumed operational control over the dry side of the WRCs in December 2002.  At this time, the City was in financial turmoil. In April 2003, the City notified Veolia that it was suspending the work associated with the design and construction of the pelletization facilities because funding was not available. The notice announced an initial suspension of 180 days, but that suspension was extended and remained in place through the termination of the parties' relationship in July 2006. By December 2003, the parties had reached an agreement on the revised scope of capital work Veolia was to perform and the amount that Veolia was to be paid for that work.  Both

parties acknowledge that there was no document formally amending the terms and conditions of the Service Agreement.  However, the parties performed under the Rescope as if it were a formal amendment to the Service Agreement. Veolia was scheduled to begin Rescope capital work in February 2004.  Shortly thereafter, the parties' relationship began to break down.  They could not agree upon changes to the original Service Agreement.

RM Clayton has four, 125-foot diameter digesters (D100, D150, D200 and D250).  The digesters consist of large concrete tanks covered by lids, with flat bottoms and domed roofs. The lids float on top of the sludge. When the sludge drops below a certain point, the lids rest on concrete supports called corbels which extend into the digester tank from the interior walls. Veolia says that the City failed to provide adequate funding to clean the digesters. Over time, foreign material, including sand, rocks, wood, rags, plastics, and other non-digestible debris, accumulates in the bottom of the digesters and reduces their useful capacity.  Therefore, digesters should be emptied and cleaned at least every five years. When Veolia assumed control, the digesters had not been cleaned for a long time, perhaps for decades.

In Spring 2005, digester capacity became an increasingly serious problem.  By March, Digesters 100, 150, and 200 were each full beyond the safe operating threshold of 95%, and Digester 250 was at 94.1% capacity.  According to Timothy

Muirhead of Veolia, heavy rains in mid-March exacerbated the problem. Plant records show that all of the RM Clayton digesters operated between 95% and 100% capacity every day between March 17 and April 8. The evidence shows that sludge overwhelmed the capacity of Digester 150 around that time. Veolia allowed sludge to enter the attic area of the lid. On the morning of April 8, 2005, the lid collapsed and sank into the tank. With Digester 150 out of service, digester capacity remained a problem throughout the year. In December 2005, Digesters 100 and 200 were over 95% full and Digester 250 was over 90% full. By late December, the remaining digesters were between 96% and 98% full. The evidence shows that sludge overwhelmed the capacity of Digester 250 around that time. On December 31, its lid collapsed and sank into the tank like the Digester 150 lid had done several months before.

The parties' relationship continued to deteriorate during 2004 and 2005. Veolia complains that the City failed to fund all of the Rescope capital work, improperly withheld payments, and regularly delivered off-specification biosolids containing grit and debris during this time period. By the end of 2004, the City owed Veolia more than $6 million for work that had been done but not paid for. The City made no payments to Veolia for operations invoices from November 2004 through November 2005. The failure to pay Veolia for its operations and maintenance invoices was a

material breach of the Service Agreement.  The City funded $13.5 million for capital work through July 2006 not the $33 million agreed to in the Rescope.  The City's failure to fund the capital improvements projects was a material breach of the Rescope Agreement.

On October 7, 2005, Veolia sent a letter to the City requesting $4,376,000 in outstanding operation and maintenance invoices and $2,408,940 for recovery of increased operation and maintenance expenses incurred between January 2004 and August 2004.   It is undisputed that the City simply failed to pay Veolia's operation and maintenance invoices for much of 2004 and 2005.  In addition, Veolia requested a $166,925 per month increase in Veolia's fixed operation and maintenance fee and a $66,225 per month increase in its capital overhead costs.  The City did not agree to these increases in Veolia's monthly fees.

Mr. Muirhead and Commissioner Robert Hunter met the following month to discuss the October 7 letter.  Mr. Muirhead brought with him to that meeting a letter declaring the City in default for nonpayment.  He testified that when he presented the letter, Mr. Hunter asked him to take it back, proposing instead that the parties work together equitably to resolve their issues.  On December 7, the City served Veolia with its own default letter.  It said that Veolia breached the Service Agreement by (1) collapsing two digester lids at RM Clayton, (2) installing centrifuges that were not

appropriate for the use to which they were put, (3) regularly allowing digesters at RM Clayton to overflow, (4) failing to provide proper staffing or personnel, (5) inaccurately reporting the quality of process water being returned to the head of the plant at RM Clayton, and (6) violating the City's emissions permits. From January to July 2006, the parties exchanged several letters raising and responding to various allegations of breaches and defaults, but they did not resolve any issues. At this point, both parties had breached the Service Agreement and/or the Rescope Agreement.

Veolia sued the City on June 19, 2006, seeking payment on outstanding invoices, recovery of costs and damages, and other relief. In response, the City filed a counterclaim seeking damages for breach of contract and tortious conduct. On July 10, 2006, the City terminated Veolia, forcing it off the site in a matter of hours. The City claimed $10,782,455.15 in damages arising from the collapse of the Digester 150 and 250 lids. These damages are broken down into three categories: (1) costs associated with repair of the lids on Digesters 150 and 250; (2) costs for odor control chemicals that the City purchased to respond to the odor created by the exposed sludge in those digesters during the time repairs were being completed; and (3) costs for rental of belt presses to process sludge between the time the lids collapsed and when they were replaced.

The relationship between the City and Veolia ended in an acrimonious mess. The myriad claims and counterclaims asserted in this lawsuit by both parties are more of the same. I conducted a non-jury trial from October 4 to October 18, 2010. The parties submitted their proposed Findings of Fact and Conclusions of Law on December 10, 2010.  I heard closing arguments on December 21, 2010.   The Court found as a matter of fact that the collapse of the digester lids was caused by the manner in which Veolia operated the digesters. Specifically, the Court found that Veolia allowed the lids to become engulfed by sludge, that Veolia allowed sludge to flow into the attic space, that Veolia then pumped sludge out of the digester tanks beneath the lids without removing the sludge in the attic space, and that, as a result, the lids collapsed under the weight of the sludge in the attic space.

The City sought to recover over $9 million in rental fees it paid to Synagro for belt presses it operated at RM Clayton after Veolia's termination as an alleged consequence of the lid failures of Digesters 150 and 250. A belt press receives sludge directly from the digester, thereby bypassing the centrifuge system and the incinerators.  It is an alternative method of sludge processing and disposal that does not use centrifuge dewatering or incineration. Veolia claimed that the City avoided various operating costs by using the belt presses and bypassing the centrifuges and incinerators.   The City contends that the cost savings were insignificant. I found that

the cost savings were insignificant in relation to the cost of using the belt presses

when the two digesters were inoperable and use of the centrifuges and incinerators to

process all of the sludge was not practical. I awarded the City $9,032,469.16 in

damages for rental of the Synagro belt presses at RM Clayton.

## II. The Appeal

Both parties appealed to the Court of Appeals for the Eleventh Circuit. The

Court of Appeals reversed the award of damages to the City for the rental of the belt

presses. It held:

> In this case, there was no evidence in the record to support a finding that
> the City's cost savings were insignificant. The district court cited to three
> portions of the trial transcript to support its finding that "the City used
> the belt presses to supplement—not replace—the centrifuges and
> incinerators." D.E. 392 at 7. But our reading of those transcript excerpts
> does not support that finding. Taken together, those excerpts suggest
> only that the City may have occasionally operated centrifuges and belt
> presses at the same time. *See, e.g.*, D.E. 362 at 141 (centrifuges were
> offline and being replaced when belt presses were used); D.E. 363 at 64
> (belt presses were needed because centrifuges were not meeting
> expectations). There is, moreover, no indication from the record as to
> how long those centrifuges were operational or whether the centrifuges
> were only being used to process waste for the two still-functioning
> digesters at RM Clayton rather than also supplementing the belt presses
> for waste associated with the digesters that had malfunctioned.
>
> On this record, there was not sufficient evidence to support the district
> court's finding that avoidance costs were insignificant, and Veolia
> introduced substantial evidence at trial that the City's cost savings were
> not insignificant. *See, e.g.*, D.E. 366 at 20-21 (testimony that the City
> avoided pumping and natural gas costs because waste was no longer
> being transferred to the centrifuges); D.E. 363 at 65 (City's lead witness

admits that there are cost savings associated with not operating centrifuges and incinerators and the City's requested damages did not offset for those savings)The district court clearly erred in finding the City's avoidance costs to be insignificant.

Veolia Water N. Am. Operating Servs., LLC v. City of Atlanta, 546 F. App'x 820, 825

(11th Cir. 2013). The Court of Appeals then remanded the case for a hearing on this

issue:

> Nevertheless, we reject Veolia's contention that the City's damages award should be reduced by the full amount of the belt press expenses because the City's failure to include avoidance costs bars any recovery. In fact, Georgia appellate courts—in the two Georgia cases primarily relied upon by Veolia in its post-judgment motion and initial brief on this issue—did not bar recovery entirely. Instead, they remanded to the trial court for additional evidentiary proceedings to determine avoidance costs. *See Hosp. Auth. of Charlton Cnty.*, 277 S.E.2d at 324 (reversing judgment and directing the trial court to grant a new trial); *Richfield Capital Corp. v. Fed. Sign Div. of Fed. Signal Corp.*, 476 S.E.2d 26, 29 (Ga. Ct. App. 1996) (remanding for determination of "actual damages suffered"). We conclude that the sounder course of action is to allow the district court, on remand, to conduct a hearing for the limited purpose of determining the significance of the City's avoidance costs, and then to recalculate the City's damages award accordingly. *See* 28 U.S.C. § 2106 (court of appeals may "remand the cause and . . . require such further proceedings to be had as may be just under the circumstances").

Id. at 825-26.

### III. The Remand Hearing

The remand hearing was conducted on March 29 through March 30, 2016. Over

Veolia's objection, the Court allowed the City to introduce evidence that had not been

produced in discovery prior to the 2010 trial. (Tr. pp.17-18)[1] ("Your objection's overruled.  The Eleventh Circuit remanded the case for me to conduct an evidentiary hearing. If they intended for the decision to be made based on the record at the trial, they could have simply reversed me on the City's damages. They didn't. They remanded it. And it seems to me that that reopened that issue with respect to the evidence to be considered and necessarily additional discovery. So I understand your point, Mr. Larson; but I allowed discovery to be conducted. I'm having an evidentiary hearing pursuant to the mandate of the Court of Appeals. And the whole point of sanctions for failure to produce evidence during discovery is to prevent unfair surprise. So whether I'm right or wrong, the one thing that I can say is there's not going to be any surprise to anybody. Everybody knows what's coming, and everybody's proceeded on that basis for the three years since the Court of Appeals issued its opinion in the case. So there we are."). The parties then submitted 106 pages of proposed findings of fact and conclusions of law. My findings of fact and conclusions of law are as follows.

1.

---

[1]     Unless otherwise indicated, all transcript citations are to the proceedings on remand.

"Under Georgia law, a calculation of damages requires consideration of any expenses that were avoided  but otherwise would have been incurred in the absence of breach." Veolia Water, 546 F. App'x at 824-25 (citing  Hosp. Auth. of Charlton Cnty. v. Bryant, 157 Ga. App. 330, 277 S.E.2d 322, 324 (1981)). However, Georgia law does not require mathematical precision in the proof of damages. All that is required is that the party seeking damages present evidence that allows the finder of fact "to estimate with reasonable certainty the amount of damages." Accent Walls, Inc. v. Parker, 162 Ga. App. 633 (1982) (quoting Bennett v. Associated Food Stores, 118 Ga. App. 711, 716, 165 S.E. 581, 585 (1968)).

## 2.

Veolia contends that, as a result of the use of the belt presses, the City "avoided costs" that it would have otherwise incurred in operating RM Clayton and that the damages associated with the belt presses should be reduced by the amount of those avoided costs. At the hearing on remand, the City presented evidence in order to respond to the Court of Appeals' observation about the evidence concerning the use of belt presses and dewatering centrifuges simultaneously and on more than an "occasional" basis. The City also presented evidence addressing directly Veolia's argument on "avoided costs."  The City's witness during the hearing on remand was Rob Bush. Mr. Bush is a licensed professional engineer in the state of Georgia.

Between 2001 and 2012, Mr. Bush was a City employee. His job duties included administration of the contract between the City and Veolia, including handling issues associated with operations at RM Clayton. During part of the 25-month period at issue on remand, Mr. Bush was the plant manager at RM Clayton. Mr. Bush is qualified as a Class I wastewater operator in the state of Georgia. At the time of the hearing on remand, Mr. Bush testified that he had spent over 200 hours performing the analysis of costs presented by the City at the hearing. That work included reviewing the City's electronic accounting records, considering the various issues that could have impacted the cost of operating RM Clayton, and preparing a detailed spreadsheet summarizing those costs. (Tr. pp. 30-39; City Exs. 601, 602, 605A, 605B, 608). The Court finds as a matter of fact that, as a result of his employment duties with the City and his training and experience in the operation of wastewater treatment plants, Mr. Bush has detailed, first-hand knowledge of the manner in which the City operated RM Clayton during the period of time at issue on remand.  The Court also finds as a matter of fact that Mr. Bush's extensive work in analyzing the issue of "avoided costs" provided a sufficient foundation for his testimony on that issue.

3.

Mr. Bush testified that the absence of lids on two of the four digesters at the RM Clayton plant resulted in the City losing the ability to digest sludge, increasing

the amount of solids to be processed by 35 to 40 percent. (Tr. pp. 24-27.) The

percentage of expected sludge digestion from operating digesters was confirmed by

Veolia's witness  Mr. Muirhead. (Tr. p. 225.) Mr. Bush also testified that the lack of

digestion had other effects on the City's ability to operate RM Clayton and the cost

associated with those operations.  For example, Mr. Bush testified that undigested

sludge is harder to dewater than digested sludge and increases the use of polymer in

the centrifuges. (Tr. p. 29) ("Without digestion you have a sticky, gooey mass. It's

probably been a long time since we have changed diapers, but imagine having a

newborn diaper and trying to send that into a centrifuge. You just don't get good

dewatering. It's difficult to handle."). He testified further that undigested sludge

produces hydrogen sulfide, a corrosive gas that impacts the electronic equipment at

the plant. Mr. Bush also said that the use of fresh water at the plant would have

increased during the time that the belt presses were in use. Finally, Mr. Bush testified

that the centrate (i.e., water that is separated from the solids) is dirtier when belt

presses are used than when centrifuges are used and that returning that centrate to the

head of the plant increases costs overall. (Tr. pp. 28-29, 47, 255-257.) Veolia offered

no testimony or other evidence to rebut Mr. Bush's testimony on those points and the

Court finds as a matter of fact that the damage to the digester lids had a significant

impact on the operation of the RM Clayton facility, including reducing the digestion of sludge.

4.

Mr. Bush testified repeatedly that the belt presses were a necessary supplement to the centrifuges in order to dewater the sludge while the digester lids were damaged and that the plant could not be operated without them. (Tr. pp. 26-27, 29-30, 41, 49, 61, 261.)  Mr. Bush performed a comparison of the operation of the centrifuges and incinerators at the RM Clayton plant during the period immediately before the digester lids were repaired and immediately after. He made that comparison in order to confirm that the City was operating the centrifuges and incinerators consistently over those periods – i.e., that the City was not using the belt presses in place of centrifuges and incinerators, but as a supplemental dewatering process. (Tr. pp. 64-69.) The evidence presented shows that the City consistently operated the centrifuges and incinerators at essentially the same level, both before and after the digester lids were replaced and the belt presses were no longer used as a supplemental dewatering process. (Tr. pp. 64-69, City Exs. 606A, 606B, 607C, 607E.) The Court finds as a matter of fact that the belt presses were used as a supplement to and not a replacement for (or instead of) operating the centrifuges at RM Clayton. Mr. Bush's testimony concerning the need for belt presses as a supplement to the centrifuges while the digester lids were broken

is confirmed by the manner in which Veolia operated RM Clayton when the digester lids were broken, particularly during the period from January 2006 to July 2006. (Tr. p. 31.) The second digester lid (the lid on D250) collapsed on December 30, 2005. Starting immediately after that event, Veolia used two belt presses to process sludge at the RM Clayton plant. (Tr. pp. 31, 176-178.)

5.

The testimony from both parties is that the digesters at RM Clayton have the capacity to hold about 4 million gallons of sludge. (Tr. pp. 155, 165, 191, 253.) Mr. Muirhead testified that two belt presses were capable of processing about 3 million gallons of sludge per month. (Tr. pp. 192-200.) By operating two belt presses from early January 2006 to the middle of July 2006, Veolia processed approximately 18 million gallons of sludge through the belt presses. That amount of sludge is more than two times the total volume of the two damaged digesters. (Tr. pp. 252-253.) The evidence also shows that the amount of sludge that Veolia was processing using the belt presses while the D150 and D250 were broken (i.e., about 3 million gallons per month) is approximately the same amount that the City was processing with the belt presses from 2006 to 2008. Mr. Muirhead testified that the City processed 86 million gallons of sludge through the belt presses during that 25-month period, or just over 3 million gallons per month. (Tr. p. 160.) Veolia paid Synagro about the same amount

each month that the City paid for those same supplemental dewatering services. And Veolia sought to recover those sums from the City as extra costs for processing sludge without any credit for avoided costs. (Tr. pp. 194-200, 207-208.)

6.

Veolia now admits that the belt presses were used to process about 40% of the sludge from 2006 to 2008. (Tr. p. 12) (Mr. Lowrey: "But about 40 percent was processed from the digesters straight to belt presses which just squeezed the sludge basically."); (Tr. p. 164) (Mr. Muirhead: "So the actual percentage on more precise bases -- you lawyers have rounded things -- but it was actually 38 percent based on the actual monthly dry weight tons of average solids for the Synagro turned out to be about 18,000 dry weight tons over the course of 25 months, about 38 percent. And the balance of the 62 coming out of the digesters is what the City processed through their system.").

7.

In order to identify any avoided costs associated with the use of belt presses the City obtained actual cost information from the operation of RM Clayton. The information relating to actual costs was obtained from the City's electronic accounting records and general ledger. (Tr. pp. 30-34.) The costs presented by the City at the hearing on remand only related to operational expenditures; capital costs associated

with RM Clayton were accounted for in a different cost code and were excluded from the analysis that the City performed. (Tr. pp. 33-34; City Exs. 605A, 605B.) While the costs are plant-specific, the City does not track costs by process within the plant. Therefore, in the City's general ledger records, operational costs associated with the "wet" side of the plant cannot be distinguished from operational costs associated with the "solids" side of the plant. (Tr. pp. 31, 255.) The main categories of operational costs analyzed by the City and presented through evidence were: (1) personnel costs; (2) utility costs; (3) chemical costs; (4) equipment maintenance and repair costs; and (5) vendor costs. Miscellaneous costs were also included. (Tr. p. 33.)

8.

Mr. Bush took information from the City's general ledger and grouped the operational costs for RM Clayton by month so that the average costs per month could be compared over four periods of time. Those periods were: (1) January 2002 to November 2002; (2) December 2002 to July 2006; (3) August 2006 to August 2008; and (4) September 2008 to June 2009. By looking at those time frames, the City was able to analyze the operational costs while the City operated RM Clayton before the contract with Veolia went into effect (Period 1), the entire period that Veolia was operating the solids side of the plant (Period 2), the period when the City operated the

plant with the broken digester lids (Period 3), and the period after the digester lids were repaired (Period 4). (Tr. pp. 31-32, 40-41.)

9.

The City used the monthly averages in each of the four periods because the operational expenses varied in each month. That variation was caused by a number of things, including variations in the amount of rainfall (which affects influent into the plant) and timing on payments for various expenses. By using an average, the City was able to normalize the costs so that they could be compared across the various periods. (Tr. p. 41.)

10.

The chart below shows: (1) the monthly average cost for electricity used at RM Clayton for each year from 2002 to 2009; and (2) the monthly average number of kilowatt hours of electricity consumed for each year from 2002 to 2009.

| **Year** | **Average Monthly Cost – US Dollars** | **Average Monthly Consumption – kW hrs** |
| --- | --- | --- |
| 2002 | 293,536.10 | 6,206,421 |
| 2003 | 277,452.50 | 5,633,684 |
| 2004 | 294,701.10 | 5,630,801 |
| 2005 | 315,434.90 | 5,672,289 |
| 2006 | 299,038.50 | 5,921,801 |

| | | |
|---|---|---|
| 2007 | 316,191.70 | 5,617,082 |
| 2008 | 381,208.50 | 5,611,813 |
| 2009 | 306,490.90 | 5,650,422 |

(City's Proposed Findings of Fact and Conclusions of Law, ¶ 35; City Ex. 601.)

11.

The chart below shows: (1) the monthly average cost for natural gas used at RM

Clayton for each year from 2002 to 2009; and (2) the monthly average number

of decatherms of natural gas consumed for each year from 2002 to 2009.

| **Year** | **Average Monthly Cost – US Dollars** | **Average Monthly Consumption – Dth** |
|---|---|---|
| 2002 | 72,390 | 14,681.19 |
| 2003 | 111,922 | 15,075.61 |
| 2004 | 104,872 | 13,256.55 |
| 2005 | 198,097 | 17,937.68 |
| 2006 | 123,978 | 14,407.71 |
| 2007 | 107,437 | 12,659.47 |
| 2008 | 182,534 | 17,417.50 |
| 2009 | 63,781 | 13,942.00 |

(City's Proposed Findings of Fact and Conclusions of Law, ¶ 36; City Ex. 600.)

Although there is more variability in the cost and consumption of natural gas across

the years analyzed, the Court does not find that variability significant. The evidence

is that not all dewatered sludge (i.e., cake) from the centrifuges is sent to the incinerators (the most significant consumer of natural gas). Some cake is trucked to landfills for final disposal. (<u>See, e.g.</u>, 2010 Trial Ex. 348 (reflecting approximately 42,000 tons of sludge transported to landfills in 2006 rather than being incinerated).)

12.

The City excluded from its calculations the amounts that were paid to Veolia for its operation of the solids side of the plant and the amounts paid to Synagro for the use of the belt presses. Mr. Bush testified why using average costs over the different operating periods permitted an accurate assessment of the avoided costs. Specifically, the evidence was that the processes used in handling the wastewater were generally the same in each period and that, on a macro scale, the influent into the plant was consistent. Therefore, all things being equal, one would expect the costs of operation to be consistent. (Tr. pp. 48-49, 258-259.) The City did identify one significant aspect of the operations at RM Clayton that changed and took steps to ensure that the change did not impact the analysis of the costs of operating the plant. Specifically, in late 2008 (after the digester lids had been repaired and the plant was operating as designed), the City began operating the "West CSO" treatment facility. The West CSO operates intermittently when there are large rainfall events and is used to treat combined sewer overflows (i.e., flows containing both sewerage and rainfall). (Tr. pp.

49-50.) Even though the West CSO is considered a separate treatment facility and has a discharge permit separate from RM Clayton, the costs associated with operating the West CSO are accounted for within the operational cost codes for RM Clayton. As a result, it is not possible to identify all the specific costs associated with operating the West CSO. In order to accurately compare the costs of operating RM Clayton (before and after the West CSO began operating), the City estimated some of the costs associated with the West CSO and removed them from its comparison. (Tr. pp. 50-59.) Mr. Bush testified, and the Court finds as a matter of fact, that not all of the costs associated with the operation of the West CSO could be accounted for and removed from the City's calculations regarding avoided costs. Therefore, the City's calculation understates the costs associated with operating the West CSO and, conversely, overstates the amount of avoided costs. (Tr. pp. 57-59, 60-61.)

13.

Mr. Muirhead offered testimony regarding his opinion on the degree to which the City realized "avoided costs." According to Mr. Muirhead, the City realized approximately $6,000,000 in "avoided costs" as a result of the use of the belt presses. The Court finds that there are at least three fatal flaws in Mr. Muirhead's testimony. First, Mr. Muirhead's testimony regarding avoided costs assumes that the City could have processed all of the sludge at RM Clayton through the centrifuges, but chose not

to do so. In other words, Mr. Muirhead assumes that the City intentionally incurred unnecessary costs to run the RM Clayton plant (choosing the more expensive belt filter process rather than using available centrifuges). The Court rejects that assumption for the same reason that the Court finds below that Veolia would not voluntarily incur unnecessary expenses to operate belt presses before its contract with the City was terminated. Additionally, as noted above, Mr. Bush testified that it was not possible to process all of the sludge through the centrifuges while the digester lids were broken. In fact, Mr. Bush testified that, but for the fact that Veolia had broken the two digester lids, the City would have had no reason to use the belt presses – that is, the sludge could have been handled through the normal processes. (Tr. pp. 261-262.) Veolia paid $2.5 million to Synagro to operate two belt presses from January to July 2006. No reasonable contractor in Veolia's position would have incurred such expenses without a realistic expectation of payment unless the belt presses were absolutely necessary to operate the plant. Second, Mr. Muirhead's assessment of the City's "avoided costs" assumes that all costs associated with processing the sludge at RM Clayton were variable – that is, the costs rise and fall in direct relation to the amount of sludge being processed. (Tr. pp. 215.) In other words, the cost per dry-weight ton of solids processed is the same regardless of the number of dry-weight tons processed – if one ton costs $10 to process, two tons will cost $20

to process and 100 tons will cost $1,000 to process. Mr. Bush pointed out the flaw in that assumption in Mr. Muirhead's testimony. (Tr. pp. 253-255.) As Mr. Muirhead admitted, the standard for determining costs in the operation of any wastewater treatment facility involves a combination of fixed and variable costs. As the City pointed out, that was the basis upon which Veolia contracted for the operation of RM Clayton in this instance. (Tr. pp. 215-219.) That comports with common sense, since some of the costs, e.g., the personnel operating the plant and equipment they use in doing so, is the same whether the plant processes 50 dry-weight tons or 100 dry-weight tons during any given period. The Court also notes, as did the City during the hearing, that Mr. Muirhead's calculated cost for processing one dry-weight ton of sludge was more than three times the contracted price at which Veolia contracted to perform that service of the City. (Tr. p. 233.) That vast difference creates substantial question regarding the accuracy of Mr. Muirhead's calculations. Third, the initial assumption on which Mr. Muirhead's entire testimony was based ignores key evidence in the record. Specifically, Mr. Muirhead assumed that the difference between the City's cost to operate the "wet" side of the RM Clayton plant while Veolia was on site (Period 2) and the cost to operate the whole plant after Veolia was terminated (Period 3) necessarily reflects the amount that the City paid to operate the "solids" side of the plant. (Tr. pp. 167-168.) Mr. Muirhead then used that number -

$393,000 - as the basis for all his calculations.  But Mr. Bush testified that there were increases in costs on the "wet" side of the plant during the post-Veolia period that resulted from the broken digester lids. (Tr. pp. 255-257.) Veolia presented nothing to rebut that testimony. The Court finds as a matter of fact that Mr. Muirhead's baseline assumption was inaccurate. As Mr. Muirhead admitted, that inaccuracy in his main assumption leads to an inaccurate conclusion. (Tr. p. 174.) Based on the evidence presented at trial, the Court finds as a matter of fact that Mr. Muirhead's testimony concerning the alleged extent to which the City "avoided costs" by operating the belt presses was unreliable. That testimony is, therefore, rejected.

14.

The City contended at trial that the proper method for assessing "avoided costs" requires comparison of the costs incurred in the period in which the City operated the RM Clayton plant using the belt presses while the digesters were broken with the costs incurred in the period once the digesters were returned to service. If the operational costs in the first period (Period 3) – excluding the costs of the Synagro belt presses – are lower than the operational costs in the second period (Period 4), then that would indicate that some operational costs were "avoided" by the use of the belt presses. (Tr. pp. 30-32, 40-42, 60-62.) The Court agrees that is the appropriate method for assessing avoided costs. Comparing those two periods, Mr. Bush testified that the City

realized approximately $3,344 per month in avoided costs as a result of the use of belt presses from August 2006 to August 2008. Over the 25-month period in question, the total avoided costs would be approximately $83,600. That amounts to approximately one quarter of one percent (.0025) of the total cost of operating the RM Clayton plant. (Tr. pp. 32, 60-62.) Mr. Bush testified, and the Court finds as a matter of fact, that the sum above likely overstates the extent to which the City avoided costs through the use of belt presses because not all costs associated with the operation of the West CSO could be quantified specifically and removed from the cost calculations. (Tr. pp. 60-61.) In any event, the evidence the City presented on remand confirms the Court's conclusion following the initial trial in this matter that any "avoided costs" were minimal.

15.

This conclusion is supported by looking at some of the actual costs of operating the plant. For example, the largest cost was for electricity. Generally, this was even greater than personnel costs.  The City paid for the electricity to operate both the centrifuges and the belt presses. (Tr. p. 91.) During the entire period in question the rate of electricity usage was remarkably consistent: about 5.6 million kilowatt hours per month.  There was no significant drop in electricity usage during 2006, 2007 and 2008 when the City was using the belt presses.  There was not a great increase in

electricity usage in 2008 and 2009 after the digester lids had been repaired and the

City was able to process 100% of the digested sludge through the centrifuges. This is

rough confirmation that Mr. Bush's method of computing avoided costs is about right.

The same is also true of natural gas usage during these periods.  At the remand hearing

and in the briefing thereafter, Veolia made no attempt to identify actual avoided costs,

i.e., reduced electricity bills. It relied entirely upon a hypothetical analysis of what it

would have cost the City to process 100% of the sludge using the centrifuges. There

are several problems with this approach.  First, I do not understand that to be what the

Court of Appeals intended.  I understand the Court of Appeals' opinion to mean that

actual avoided costs were to be deducted from the City's damages. (Tr. p. 84) ("THE

COURT: Well, let me interrupt you, Mr. Larson. Just so I'm not making a big mistake

here, I think what the Court of Appeals referred to as avoided costs is not to be

determined based upon the assumption that the digester lids were still functional. I

think what the Court of Appeals was referring to as avoided costs is avoided costs

after the lids collapsed, not on some hypothetical situation but on the actual situation.

Am I wrong about that? MR. LARSON: I think you are, Your Honor."); (Tr. p. 105)

("THE COURT: Mr. Sheppard, do you understand the distinction I'm making between

a hypothetical cost and the actual cost? MR. SHEPPARD: I do, Your Honor. THE

COURT: What's the City's position on that? MR. SHEPPARD: I think you have got

it exactly right. That's why we analyzed it the way we did."). Second, the hypothetical assumption that all of the sludge could be processed through the centrifuges is contrary to the evidence presented at the hearing. Third, the theoretical cost to the City of processing digested sludge through the centrifuges is not an avoided cost at all. It is an irrelevant number in this context.

16.

The City presented evidence in the first trial of the amount it paid to Synagro for the use of the belt presses. That sum was $9,032,469.16. On remand, the City presented evidence concerning the amounts that properly should be deducted from the costs of the belt presses based on the City's "avoided costs." The Court concludes that the City's damages associated with the belt presses should be reduced by the sum of $83,600 ($3,344 per month multiplied by 25 months). Therefore, the Court concludes that the City's damages associated with the use of belt presses are $8,948,869.16.

17.

Pursuant to the mandate of the Court of Appeals, the adjusted damage awards are as follows:

City of Atlanta:

| | |
|---|---|
| Damages Affirmed on Appeal | $1,151,874.37 |
| Recalculated Belt Press Costs | $8,948,869.16 |
| Pre-Judgment Interest on $1,151,874.37 | $   116,007.95 |
| Pre-Judgment Interest on $8,948,869.16 | $2,292,136.33 |
| (Interest Accrued on Letter of Credit) | ($ 866,336.24) |
| Total Damages | $11,642,551.60 |

Veolia:

| | |
|---|---|
| Damages Not Subject to Appeal | $5,596,562.42 |
| Pre-Judgment Interest | $2,208,313.89 |
| Letter of Credit | $9,525,866.42 |
| Total Damages | $17,330,742.70 |

18.

Pursuant to the mandate of the Court of Appeals, Veolia is not entitled to additional pre-judgment interest because the City's damages exceed the amount drawn down on the Letter of Credit.

## IV. Conclusion

The Clerk is directed to enter an amended judgment awarding Veolia the net damages of $5,688,191.10.

SO ORDERED, this 14 day of July, 2016.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge